JS 44 (Rev. 0 )

# CIVIL COVER SHEET

2:10-cv-36

The JS 44 ci      the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by      This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Joseph Fusco

**DEFENDANTS**

Uber Technologies, Inc.

**(b)** County of Residence of First Listed Plaintiff    Camden
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    San Francisco
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Matthew A. Luber, Esquire, McOmber & McOmber P.C., 30 S. Maple Avenue, Marlton, NJ, 08053, 856-985-9800

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | |
|---|---|
| ❏ 1  U.S. Government Plaintiff | ❏ 3  Federal Question *(U.S. Government Not a Party)* |
| ❏ 2  U.S. Government Defendant | ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ❏ 1 | ❏ 1 | Incorporated *or* Principal Place of Business In This State | ❏ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ❏ 2 | Incorporated *and* Principal Place of Business In Another State | ❏ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ❏ 3 | ❏ 3 | Foreign Nation | ❏ 6 | ❏ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ❏ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ❏ 625 Drug Related Seizure of Property 21 USC 881 | ❏ 422 Appeal 28 USC 158 | ❏ 375 False Claims Act |
| ❏ 120 Marine | ❏ 310 Airplane | ❏ 365 Personal Injury - Product Liability | ❏ 690 Other | ❏ 423 Withdrawal 28 USC 157 | ❏ 376 Qui Tam (31 USC 3729(a)) |
| ❏ 130 Miller Act | ❏ 315 Airplane Product Liability | ❏ 367 Health Care/ | | | ❏ 400 State Reapportionment |
| ❏ 140 Negotiable Instrument | ❏ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ❏ 410 Antitrust |
| ❏ 150 Recovery of Overpayment & Enforcement of Judgment | ❏ 330 Federal Employers' Liability | Product Liability | | ❏ 820 Copyrights | ❏ 430 Banks and Banking |
| ❏ 151 Medicare Act | ❏ 340 Marine | ❏ 368 Asbestos Personal Injury Product | | ❏ 830 Patent | ❏ 450 Commerce |
| ❏ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ❏ 345 Marine Product Liability | Liability | | ❏ 840 Trademark | ❏ 460 Deportation |
| | | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ❏ 470 Racketeer Influenced and Corrupt Organizations |
| ❏ 153 Recovery of Overpayment of Veteran's Benefits | ❏ 350 Motor Vehicle | ❏ 370 Other Fraud | ❏ 710 Fair Labor Standards Act | ❏ 861 HIA (1395ff) | ❏ 480 Consumer Credit |
| ❏ 160 Stockholders' Suits | ❏ 355 Motor Vehicle Product Liability | ❏ 371 Truth in Lending | ❏ 720 Labor/Management Relations | ❏ 862 Black Lung (923) | ❏ 490 Cable/Sat TV |
| ❏ 190 Other Contract | ☒ 360 Other Personal Injury | ❏ 380 Other Personal Property Damage | ❏ 740 Railway Labor Act | ❏ 863 DIWC/DIWW (405(g)) | ❏ 850 Securities/Commodities/ Exchange |
| ❏ 195 Contract Product Liability | ❏ 362 Personal Injury - Medical Malpractice | ❏ 385 Property Damage Product Liability | ❏ 751 Family and Medical Leave Act | ❏ 864 SSID Title XVI | ❏ 890 Other Statutory Actions |
| ❏ 196 Franchise | | | ❏ 790 Other Labor Litigation | ❏ 865 RSI (405(g)) | ❏ 891 Agricultural Acts |
| | | | ❏ 791 Employee Retirement Income Security Act | | ❏ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ❏ 895 Freedom of Information Act |
| ❏ 210 Land Condemnation | ❏ 440 Other Civil Rights | **Habeas Corpus:** | | ❏ 870 Taxes (U.S. Plaintiff or Defendant) | ❏ 896 Arbitration |
| ❏ 220 Foreclosure | ❏ 441 Voting | ❏ 463 Alien Detainee | | ❏ 871 IRS—Third Party 26 USC 7609 | ❏ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ❏ 230 Rent Lease & Ejectment | ❏ 442 Employment | ❏ 510 Motions to Vacate Sentence | | | ❏ 950 Constitutionality of State Statutes |
| ❏ 240 Torts to Land | ❏ 443 Housing/ Accommodations | ❏ 530 General | | | |
| ❏ 245 Tort Product Liability | ❏ 445 Amer. w/Disabilities - Employment | ❏ 535 Death Penalty | **IMMIGRATION** | | |
| ❏ 290 All Other Real Property | ❏ 446 Amer. w/Disabilities - Other | **Other:** | ❏ 462 Naturalization Application | | |
| | ❏ 448 Education | ❏ 540 Mandamus & Other | ❏ 465 Other Immigration Actions | | |
| | | ❏ 550 Civil Rights | | | |
| | | ❏ 555 Prison Condition | | | |
| | | ❏ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | |
|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ❏ 2 Removed from State Court | ❏ 3 Remanded from Appellate Court | ❏ 4 Reinstated or Reopened | ❏ 5 Transferred from Another District *(specify)* | ❏ 6 Multidistrict Litigation - Transfer | ❏ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause:
Plaintiff was severely beaten by Defendant's driver.

## VII. REQUESTED IN COMPLAINT:

❏ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

**JURY DEMAND:**   ☒ Yes   ❏ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions:)*

JUDGE

DOCKET NUMBER

DATE   1/5/17

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

JAN -5 2017



**UNITED STATES DISTRICT COURT**

**17**   **0036**

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 163 Orchard Lane Cherry Hill NJ 08003

Address of Defendant: 1455 Market Street San Francisco, California 94105

Place of Accident, Incident or Transaction: Philadelphia County — 10th and Market St.

*(Use Reverse Side For Additional Space)*

Phil adelphia PA

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?
(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))        Yes☐  No☒

Does this case involve multidistrict litigation possibilities?        Yes☐  No☒
*RELATED CASE, IF ANY:*
Case Number: _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
        Yes☐  No☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
        Yes☐  No☒

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
        Yes☐  No☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
        Yes☐  No☒

CIVIL: (Place ✔ in ONE CATEGORY ONLY)

A. *Federal Question Cases*:

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify) _____

B. *Diversity Jurisdiction Cases*:

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☒ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

**ARBITRATION CERTIFICATION**
*(Check Appropriate Category)*

I, Matthew Lubell , counsel of record do hereby certify:

☐ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE: 1/5/17        Matthew Lubell        309323
                    Attorney-at-Law        Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 1/5/17        _____        309323
                    Attorney-at-Law        Attorney I.D.#

CIV. 609 (5/2012)

JAN -5 2017



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

Joseph Fusco                              :          CIVIL ACTION
                          v.                :
          Uber Technologies, Inc. :          NO.  **17    0036**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for
plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of
filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse
side of this form.) In the event that a defendant does not agree with the plaintiff regarding said
designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on
the plaintiff and all other parties, a Case Management Track Designation Form specifying the track
to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.          (   )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
     and Human Services denying plaintiff Social Security Benefits.          (   )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.   (   )

(d) Asbestos – Cases involving claims for personal injury or property damage from
     exposure to asbestos.          (   )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
     commonly referred to as complex and that need special or intense management by
     the court. (See reverse side of this form for a detailed explanation of special
     management cases.)          (   )

(f) Standard Management – Cases that do not fall into any one of the other tracks.          (  X  )

| | | |
|---|---|---|
| 1/5/17 | Matthew A. Luber | Joseph Fusio |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 856-985-9800 | 732-530-8545 | mal@njlegal.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JAN - 5 2017



**McOmber & McOmber**

A PROFESSIONAL CORPORATION

COUNSELLORS AT LAW

RICHARD D. McOMBER
ADRIENNE HAROUTUNIAN McOMBER
THOMAS J. WARREN
J. PETER SOKOL
R. ARMEN McOMBER*
CHRISTIAN V. McOMBER*
MATTHEW A. LUBER◊
ELIZABETH A. MATECKI△
  *RULE 1:40 QUALIFIED MEDIATOR
  ◊ ADMITTED IN NJ & PA
  △ADMITTED IN NJ & NY

54 SHREWSBURY AVENUE
RED BANK, NEW JERSEY 07701
(732) 842-6500
FAX: (732) 530-8545

www.NJLegal.com

30 S. MAPLE AVENUE, SUITE 201
MARLTON, NEW JERSEY 08053
(856) 985-9800
FAX: (732) 530-8545

PLEASE REPLY TO RED BANK

January 5, 2017

*Via Courier*

Clerk
United States District Court
   Eastern District of Pennsylvania
Courthouse
601 Market Street
Philadelphia, PA 19106

> RE: Joseph Fusco v. Uber Technologies, Inc.
> Our File No: 11305

Dear Sir/Madam:

Enclosed please find an original and one copy of the Civil Cover Sheet and Complaint in the above-referenced matter. Also, enclosed for the Court is a flash drive containing those documents. Kindly file the original and return a time-stamped copy for our file.

Further, this firm's credit card account is on file with the Court for the withdrawal of the costs associated with filing this Complaint.

Very truly yours,

MATTHEW A. LUBER

MAL/doc
Enclosure



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

------------------------------------- X

JOSEPH FUSCO,

      Plaintiff,

  - vs. -

UBER TECHNOLOGIES, INC.,

      Defendants.

------------------------------------- X

**Civil Action No. ___ 1 7   0 0 3 6**

**COMPLAINT**

**JURY TRIAL DEMANDED**

      Plaintiff Joseph Fusco ("Plaintiff"), by and through his undersigned attorneys, hereby files the following Complaint and Jury Demand against Defendant Uber Technologies, Inc. ("Uber").

## INTRODUCTION

      1.    Uber is a global online transportation company headquartered in San Francisco, California. Uber is the creator and provider of the Uber app ("App"), a downloadable software application that allows consumers to request a taxi-like ride with the push of a button on a smartphone. Once a consumer requests a ride, a nearby Uber driver "accepts" the request and the App displays an estimated time of arrival for the Uber driver to arrive at the consumer's pickup location. The App also notifies the consumer when the driver is about to arrive and it provides general information about the driver (e.g., first name, vehicle type, and license plate number). The rider then enters the preferred destination, which the rider can do before or during the ride. Upon arriving at a destination, the rider exits the vehicle and the fare is automatically calculated and charged to the payment method linked to the rider's Uber account—typically a credit card.[1]

      2.    At first blush, Uber sounds fantastic. From a business perspective, the App eliminates the need for dispatchers and cuts down on wasteful time that full-time cab-drivers might

---

[1] Uber keeps a percentage of the fare paid by the rider.

spend driving around looking for fares. For the consumer, the experience is supposed to be easy and completed entirely through the App. But a deeper assessment reveals that Uber's service inherently puts consumers at serious risk and that the company has sacrificed rider safety to realize rapid and global expansion. Even worse, Uber targets consumers that are either defenseless or in a vulnerable state while falsely telling consumers that the company's service is entirely safe.

3.     Plaintiff was Uber's archetypal customer—an individual looking for a safe ride home after consuming alcohol. Uber realizes it must inform consumers of strong safety measures to induce riders to book a trip with its drivers, particularly after consuming alcohol. Some common Uber taglines are "Drink Responsibly, Drive with Uber" and "Don't Drink and Drive, Take an Uber Safe Ride." Uber represents it "uses technology to keep drivers and riders safe... which is all backed up by a robust system of pre-screenings of drivers." Even further, Uber has repeatedly pointed to drunk-driving reduction as a key benefit of its service. For example, on its website, Uber refers to a report issued by Temple University professors that claims to show a correlation between decreased alcohol-related driving fatalities and the introduction of Uber services. Uber states: "At Uber, safety has always been a top priority, and we take that commitment very seriously. We have partnered with Mothers Against Drunk Driving (MADD) and many other valued community stakeholders to build a world where a safe ride is always within reach and drunk-driving is a thing of the past." *See* https://newsroom.uber.com/us-pennsylvania/temple-research/. While Uber uses these marketing strategies to hook the masses, Uber's claim of safety is a complete and total sham, and Uber knows it.

4.     Plaintiff experienced this first-hand. Plaintiff is a Director of Public Safety employed by Allied Universal. On December, 22, 2016, Plaintiff attended a private holiday party with colleagues at a restaurant located in the University City section of Philadelphia, Pennsylvania.

Plaintiff knew that alcohol would be served at the party. Rather than risk drinking and driving, Plaintiff took a train into Center City Philadelphia from his home in Southern New Jersey. Plaintiff planned to utilize Uber's services for his ride home.

5.      At approximately 11:00PM, Plaintiff left the restaurant and used his Uber App to request a ride home. The Uber driver ("Uber Driver") responded to the request and Plaintiff entered the vehicle, sitting in the front seat of the driver's Toyota Corolla. Plaintiff explained to the Uber Driver that he would like to be taken to his residence in Cherry Hill, New Jersey.[2] Upon learning Plaintiff's destination, the Uber Driver refused service and demanded Plaintiff to "get out" of the vehicle. After Plaintiff asked again to be taken to his desired destination, the Uber Driver exited the driver's seat, walked around the back of the car, and opened the front passenger door. The Uber Driver then dragged Plaintiff out of the front seat by his coat collar and severely beat Plaintiff, breaking multiples bones on his face, knocking out teeth, and leaving him in a pool of blood on the pavement (with his body partially in the street) in the freezing cold. The Uber Driver stomped and kicked Plaintiff in the face and head while he was already unconscious, which upon information and belief, is captured on surveillance video.

6.      The Uber Driver immediately fled the scene in his vehicle and remains at large while University of Pennsylvania Police organize efforts to identify him and effect an arrest. Two bystanders eventually found Plaintiff unconscious, and they promptly called 911. Plaintiff was transported to Presbyterian Hospital by ambulance just minutes later.

---

[2] Upon information and belief, Uber Drivers must accept all ride requests when the Uber Drivers are logged into the App and the Uber Driver is not necessarily privy to the rider's destination. This is to ensure that an Uber Driver will not refuse a ride based upon destination or because it is not an ideal fare.

7.      Adding insult to injury, the Uber Driver not only failed to report the incident (to Uber or the authorities), he charged Plaintiff for a 28-minute ride across the city of Philadelphia after leaving Plaintiff for dead.

**From:** Uber Receipts <uber.us@uber.com>
**Date:** December 22, 2016 at 11:44:29 PM EST
**To:** xxxxxx@yahoo.com
**Subject: Your Thursday evening trip with Uber**



8.      Upon information and belief, Uber has refused to fully cooperate with the police in providing information that would assist in identifying the Uber Driver.  Despite being informed that one of their drivers had severely assaulted Plaintiff and was the subject of an ongoing criminal investigation, Uber permitted the Uber Driver to continue working without repercussion.  As a result of the assault and battery, which occurred while the Uber Driver worked under the direct control of Uber as an agent and/or employee, Plaintiff sustained physical and emotional injuries from which he may never fully recover.

9.      Uber's negligence, fraud, and misleading statements regarding the safety of its services is just as much, if not more, to blame for Plaintiff's injuries.  Uber buries in fine print that it cannot exercise any actual control over their drivers while they work (which is false), it disclaims any representation of rider safety (riders get in the car at their own risk according to the App's terms and conditions), and fails to effectively screen drivers and monitor their conduct (while telling consumers drivers are put through a "rigorous" screening process).  All of this is directly

4

contrary to Uber's representations to the public in general and to Plaintiff in particular. The number of reported incidents is hardly surprising and speak for themselves.

10.     Plaintiff accordingly brings this lawsuit, which not only seeks to compensate Plaintiff for his injuries, but to expose Uber's deceitful pledge to rider safety.

## PARTIES

11.     Plaintiff is an adult male and a citizen of New Jersey.

12.     Defendant Uber Technologies, Inc. is a Delaware Corporation with its principal place of business at 1455 Market Street, San Francisco, California 94105. Uber operates throughout the United States, including in Philadelphia, Pennsylvania maintaining an office at 7821 Bartram Ave, Philadelphia, PA 19153.

## JURISDICTION AND VENUE

13.     The jurisdiction of this action arises under diversity of citizenship, which is codified pursuant to 28 U.S.C. § 1332. Plaintiff is a citizen of New Jersey and Uber is a citizen of California. This action involves an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

14.     The Court has personal jurisdiction because Uber conducts business in Pennsylvania and the transactions and occurrences that give rise to this lawsuit took place in Pennsylvania.

15.     Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) because Uber conducts business in this District and the transactions and occurrences that gives rise to this lawsuit took place in this District.

## **FACTUAL BACKGROUND**

### **Uber Drivers Are Employees, Not Independent Contractors**

16.     Uber is rapidly expanding.  As of this year, the service is available in over 66 countries and 545 cities worldwide.  It is projected that the Company will generate billions of dollars in revenue this year alone.  This is because almost *anyone* can be an Uber driver, which is a central part of the company's marketing scheme.  As shown on the company's website:



**Make good money.** Got a car? Turn it into a money machine. The city is buzzing and Uber makes it easy for you to cash in on the action. Plus, you've already got everything you need to get started.



**Drive when you want.**
Need something outside the 9 to 5? As an independent contractor with Uber, you've got freedom and flexibility to drive whenever you have time. Set your own schedule, so you can be there for all of life's most important moments.



**No office, no boss.**
Whether you're supporting your family or saving for something big, Uber gives you the freedom to get behind the wheel when it makes sense for you. Choose when you drive, where you go, and who you pick up.

17.     Upon information and belief, Uber employs more than a million drivers.  Uber takes a fee ranging between twenty and thirty percent of every ride charged to customers.

18.     Uber holds itself out as nothing more than a technological platform designed simply to enable consumers to have easy access to transportation; the reality is, Uber is involved in virtually every aspect of the operation and retains significant control over its drivers.

19.     Upon information and belief, as a matter of policy, Uber maintains strict control over its drivers including, but not limited to, proper and desirable conduct in dealing with

passengers, optimal routes and travel times, fee arrangements and pricing, and vehicle maintenance requirements.

20.     Uber drivers are specifically instructed on proper conduct and standards expected by Uber though instructional videos, handbooks, and training sessions.   Failure to follow the mandatory standards leaves drivers subject to poor ratings and reviews, diminished access to fares and a lock-out from the application - tantamount to termination of the driver's employment with Uber.  For example, upon information and belief:

       a.     Uber has the discretion to fire its drivers for any reason and at any time.

       b.     Drivers are not charged a fee by Uber to apply to become employees.

       c.     Drivers are not charged a fee to download the App to receive notifications of rides requested via the App.

       d.     Uber recently announced that drivers will have guaranteed earnings.

       e.     Fare prices for rides are set exclusively by Uber and drivers are not permitted to negotiate with customers.

       f.     Uber controls its drivers' contact/customer list and drivers are not permitted to book Uber customers unless it is through the App.

       g.     Uber requires its drivers to accept all ride requests when the drivers are logged into the App.  Drivers that reject too many ride requests risk facing discipline, including suspension or termination.

       h.     Uber has a dress code for drivers.

       i.     Uber requires drivers to send the customer a text message when the driver is close to the pickup location.

j.      Uber trains drivers on compliance with local regulations, down to the placement of the Uber placard:



k.      Uber dictates the radio stations utilized by drivers.

l.      Uber requires drivers to open the door for the customer and to pick up the customer on the correct side of the street.

m.      Drivers who accept trip requests are required to bring the driver to the preferred destination.

**Uber Is a Public Transportation Carrier, Not Merely a Technology Company**

21.     Because Uber transports persons for profit, Uber's operation has been challenged by governments and taxi companies.

22.     Uber drivers are commonly referred to as "pirate taxies" that present unfair competition to taxis.

23.     Upon information and belief, in many jurisdictions, Uber does not pay taxes or licensing fees; it endangers passengers; and drivers are untrained, unlicensed, and uninsured/underinsured.

24.     Pennsylvania's Public Utility Commission ("PUC") regulates motor carriers that transport property and passengers in Pennsylvania for compensation.

25.     66 Pa. C.S. §102 defines the term "public utility", in pertinent part, as follows: "(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for: ... (iii) Transporting passengers or property as a common carrier."

26.     66 Pa. C.S. §102 defines the term "common carrier" as follows: "Any and all persons or corporations holding out, offering, or undertaking, directly or indirectly, service for compensation to the public for the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by, through, over, above, or under land, water, or air, and shall include forwarders, but shall not include contract carriers by motor vehicles, or brokers, or any bona fide cooperative association transporting property exclusively for the members of such association on a nonprofit basis."

27.     In June 2014, Uber applied to the PUC for authority to operate as a motor common carrier of persons.

28.     In early 2015, the PUC granted ridesharing companies, including Uber, licenses that allow them to operate throughout Pennsylvania, but the services continued to be illegal in Philadelphia due to the Philadelphia Parking Authority's ("PPA") exclusive regulatory authority in the city. Uber continued to operate in Philadelphia despite the lack of explicit authority. *See Application of Rasier-PA LLC*, Docket No. A-2014-2416127 (Dec. 5, 2014), *reconsideration denied*, Docket No. A-2014-2416127 (Jan 29, 2015).

29.     In April 2016, the Pennsylvania Commonwealth Court affirmed the PUC's grant of a certificate of public convenience for authority to operate as a common carrier to Raiser-PA, LLC ("Raiser") in Pennsylvania, excluding Philadelphia. Raiser is a local subsidiary of Uber.

30.     Raiser requested that the PUC approve of its services in June 2014, although Uber had been illegally operating in Pennsylvania since February 2014, for which the PUC fined Uber approximately $11,000,000.

31.     The PUC approved Raiser's application to operate as a common-carrier on December 5, 2014.

32.     In October 2016, Philadelphia Court of Common Pleas Judge Linda Carpenter issued a cease and desist order against Uber, which is the result of application for a restraining order filed by Philadelphia's taxicab alliances.

33.     On November 4, 2016, Pennsylvania enacted Senate Bill 984, which established a basic regulatory framework for the operation of transportation network companies in every county in Pennsylvania and for regulation by the PUC.

34.     This legislation sets minimum standards to ensure transportation network companies operate safely and responsibly. For example, companies and drivers are required to maintain proper insurance coverage, meet vehicle safety requirements, report accidents, and there is a zero-tolerance policy on the use of drugs or alcohol for a driver using the digital network. The also prevents individuals convicted of certain crimes, including burglary, robbery and sexual offenses, from offering transportation network services. *See* ttp://www.legis.state.pa.us/cfdocs/legis/li/uconsCheck.cfm?yr=2016&sessInd=0&act=164.

35.     Because Uber's drivers use their vehicles for personal and public transportation— which is prohibited for common carries—the legislature has a created a new definition for transportation network companies, "Dual motor carrier":

> **"Dual motor carrier":** A call or demand carrier operating under a certificate of public convenience and providing transportation network services pursuant to a license from the commission. For purposes of this chapter, only certificated call or demand carriers

10

may file an application with the commission requesting a license to operate a transportation network service as a dual motor carrier.

**"Dual motor carrier driver."** An individual who:

(1) receives connections to potential passengers and related services from a dual motor carrier in exchange for payment of a fee to the dual motor carrier; and

(2) uses a personal vehicle to offer or provide a prearranged ride to passengers upon connection through a digital network controlled by a dual motor carrier in return for compensation or payment of a fee.

36.    Despite Uber's claim that it is merely a transportation broker and Pennsylvania's recent legislation that allows Uber drivers to use vehicle public and personal transportation, Uber's driver operates no differently than a common carrier when servicing consumers.[3]

37.    In Pennsylvania, it is a well-settled principle that public transportation carriers are responsible for exercising a high degree of care to protect passengers.

38.    The liability of a public transportation carrier for an assault by one of its employees on a passenger is not dependent on the question as to whether the employee was acting within the scope of his authority or in the line of his duty, but is based upon its broad duty as a transportation carrier to protect its passengers from assault.

**Uber Knows Its Driver Vetting Process is Flawed But
Represents to Riders that Uber Provides the Safest Rides on the Road**

39.    Despite its representations, advertising, and promotional materials, Uber cannot assure riders of the safety of the driver behind the wheel.  To the contrary, Uber's services put consumers at an increased risk.

---

[3] *E.g.*, *O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133, 1141-42 (N.D. Cal. 2015) ("Uber does not simply sell software; it sells rides. Uber is no more a 'technology company' than Yellow Cab is a 'technology company' because it uses CB radios to dispatch taxi cabs. ... however, the focus is on the substance of what the firm actually does (e.g., sells cab rides), it is clear that Uber is most certainly a transportation company, albeit a technologically sophisticated one.").

40.     The   number   of   reported   incidents   speak   for   themselves.   *See* http://www.whosdrivingyou.org/rideshare-incidents.   Upon information and belief, over thirty different sexual assaults by Uber drivers against Uber passengers have been reported in the media in the last two years alone.

41.     On February 6, 2015, in Philadelphia, Pennsylvania, a female rider alleges that she was raped and kidnapped by her Uber driver.  According to a police report and media outlets, the Uber driver held her down, ripped her pants, raped her, and then held her captive, continuing to drive her around for nearly two hours, refusing to let her out of the car.  Upon information and belief, Uber was unaware of the incident until forty days after the victim first reported the alleged sexual assault and the suspect continued to drive for Uber, for the duration of that time.

42.     Indeed, these incidents were reported in just the last several months:

   a.      12/19/16: Uber driver in Michigan Stabs Passenger 5 times because passenger "Disrespected" the car.

   b.      11/30/16: Uber driver dumps women in a deserted reservoir in London.

   c.      11/7/2016: Uber driver at Penn State hit police officer with his car and dragged the officer 20 feet.

   d.      10/29/16: Uber driver kidnapped and assaulted passenger in College Park, Maryland.

   e.      10/21/16: Uber driver harassed female passengers and fled from police.

   f.      10/17/16: Uber driver in Atlanta punched female passenger in the face.

43.     Uber has, and continues to, knowingly mislead the public about the safety and security measures it employs for rider safety.  Riders, such as Plaintiff, reasonably relied on Uber's

representations and promises about its safety and security measures, including its driver screening and background check procedures.

44.     Uber knew that its representations and promises about rider safety were false and misleading, yet continued to allow its riders to believe in the truth of its representations and promises, and to profit from its riders' reliance on such representations and promises.

45.     Upon information and belief, Uber has fought legislation and other measures requiring, among other things, strong background checks for its drivers.

46.     Upon information and belief, Uber currently uses a third-party vendor, Checkr Inc. ("Checkr"), to run security checks on its drivers.

47.     Upon information and belief, Checkr merely identifies addresses matching any convictions to screen Uber drivers.

48.     To become a driver for Uber, individuals apply through Uber's website.   The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance.

49.     To become an Uber driver, an individual must be at least 21 years of age, have at least one year of driving experience, have a valid US driver's license, have an eligible 4-door vehicle, and have proof of vehicle registration and insurance, and completion of online screening. That is all.

50.     Upon information and belief, Uber does not do any of the follow:

     a.     verify vehicle ownership (it only requires that the vehicle is registered and is not more than ten years old);

     b.     require a car inspection prior to use by a driver (Uber does not require periodic/updated inspections either);

13

c.     verify that the person applying to be the driver is uploading his or her own personal documents;

d.     verify that the person who is driving is the same person who opened that account;

e.     require drivers to submit fingerprints for comparison against Department of Justice and Federal Bureau of Investigation databases;

f.     conduct Live Scan biometric fingerprint background checks of applicants;

g.     conduct in-person interviews of applicants;

h.     verify that social security numbers and other personal identification numbers submitted in the application process belong to the applicants;

i.     require drivers to attend training classes on driving skills;

j.     require drivers to attend training classes on harassment or violence;

k.     require drivers to attend training classes to hone skills needed for safely using mobile Apps while driving;

l.     require driver to pass written examinations;

m.     require drivers to pass road vehicle tests; and

n.     require drivers to pass vision and hearing exams; and/or

o.     conduct follow-up background checks.

51.     In short, the application process to become an Uber driver is simple, fast, and designed to allow the Company to hire as many drivers as possible, all at the expense of rider safety—Uber's claimed number one priority.  Upon information and belief, a number of individuals have passed Uber's screening process despite serious felony convictions and there have

been reports of individuals driving Uber cars where that person was not the person on the Uber profile.[4]

52.     But consumers, like Plaintiff, see this on Uber's website:



53.     Uber represents to customers, on a global scale through its website, that its services are safe because:

      a.     "Uber uses technology to keep drivers and riders safe, for instance by GPS-tracking every ride and allowing riders to share their journeys in real time with families or friends. This is all backed up by a robust system of pre-screenings of drivers. We also have a dedicated incident response team on call 24/7 to investigate safety incidents."

      b.     "Actions that threaten the safety of drivers and riders will be investigated and, if confirmed, lead to permanent deactivation of your account."

      c.     "Physical contact with riders. As our community guidelines make clear, you shouldn't touch or flirt with other people in the car. As a reminder, Uber has

---

[4] Media outlets have reportedly confirmed the problem by having reporters submit false documents to Uber and still getting approved to be a driver

a no sex rule. That's no sexual conduct with riders, no matter what. And you should never hit or otherwise hurt a rider."

d.   "If we are made aware of this type of problematic behavior, we will contact you so we can investigate them. Depending on the nature of the concern, we may put a hold on your account during our investigation. If the issues raised are serious or a repeat offense, or you refuse to cooperate, you may lose access to Uber. Any behavior involving violence, sexual misconduct, harassment, discrimination, or illegal activity while using Uber can result in the immediate loss of your account. Uber will also deactivate the account of any driver who receives several or serious complaints of poor, unsafe, or distracted driving while using the Uber app.

e.   "Additionally, when law enforcement is involved, we will cooperate with their investigation in accordance with our Law Enforcement Guidelines."

f.   "We expect drivers using the Uber app to act in compliance with all relevant state, federal and local laws and the rules of the road at all times. This includes meeting the regulatory requirements for rideshare or for-hire drivers in your area.

g.   "All drivers wanting to use the Uber app are required to undergo a screening process, like motor vehicle record and background checks, to ensure safety and compliance with our criteria."

h.   "Uber's mission is to connect riders to reliable transportation, everywhere for everyone. We have a zero tolerance policy towards discrimination of any kind at Uber."

i.    *"*What leads to you losing access to your account? It is unacceptable to refuse to provide services based on where someone is going, or characteristics like a person's race, religion, national origin, disability, sexual orientation, sex, marital status, gender identity, age or any other characteristic protected under relevant federal, state or local law. Actions like these will result in permanent deactivation of your account."

j.    "A Positive Influence: There is a strong correlation between Uber's presence in cities and the reduction in drunk driving. And we've partnered with the Mothers Against Drunk Driving (MADD) in the US to raise awareness about safer ways to get home. Because having more options leads to better outcomes."

k.    "Always available 24/7: Like the cities we operate in, Uber is always on. And that counts extra in times of emergency, when getting a reliable ride to a safe destination is most vital. We also work with the American Red Cross to help communities we serve during natural disasters."

l.    "Safety first: Everyone wants to get from A to B safely. So please ensure that you follow the local law. Check out our rider safety tips. Whether you're in the front or the back seat, buckle up when you get into the car — and please leave your guns at home. Of course, drivers have a particular responsibility when it comes to safety at Uber……"

m.    "Give riders and drivers some personal space: We all value our personal space and privacy. It's OK to chat with other people in the car. But please don't comment on someone's appearance or ask whether they are single. As a

17

passenger, if you need to make a phone call, keep your voice down to avoid disturbing your driver or other riders. And don't touch or flirt with other people in the car. As a reminder, Uber has a no sex rule. That's no sexual conduct between drivers and riders, no matter what."

n.     "Treat your fellow riders and drivers as you would like to be treated yourself: with respect."

o.     "Always the ride you want. The best way to get wherever you're going"

p.     "Always on, always available: No phone calls to make, no pick-ups to schedule.  With 24/7 availability, request a ride any time of day, any day of the year."

q.     "You rate, we listen: Rate your driver and provide anonymous feedback about your trip.  Your input helps us make every ride a 5-star experience."

r.     Uber also has partnered with "Breathometer," a smartphone breathalyzer, to combat drunk-driving.

54.    And yet, Uber disclaims all supervision and responsibility for the conduct of its drivers.  Buried in the legal section of the App is the following disclaimer:

**5. Disclaimers; Limitation of Liability; Indemnity.**

**DISCLAIMER.**

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE

USE OF THE SERVICES, OR THAT THE SERVICES WILL BE
UNINTERRUPTED OR ERROR-FREE. UBER DOES NOT
GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR
ABILITY OF THIRD PARTY PROVIDERS. YOU AGREE THAT
THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE
SERVICES, AND ANY SERVICE OR GOOD REQUESTED IN
CONNECTION THEREWITH, REMAINS SOLELY WITH YOU,
TO   THE   MAXIMUM   EXTENT   PERMITTED   UNDER
APPLICABLE LAW.

55.    Uber's targeting of intoxicated consumers, under the guise of being able to provide

a safe ride, only compounds the problem.  *See* https://www.uber.com/helping-cities/.  Adds like

these are routinely peddled by Uber:

 

**Plaintiff Is Nearly Beaten to Death By An Uber Driver**

56.    On December, 22, 2016, Plaintiff took the Market-Frankford train line to University

City District of Philadelphia.  Once in University City, Plaintiff met a colleague to walk to

Cavanagh's Restaurant and Sports Bar, located on S. 39th St., Philadelphia, PA.

57.    Plaintiff then attended a private party with other employees of Allied Universal and

other prominent local safety officials, such as Cherrie Heller, Director of Public Safety for the

University of Pennsylvania and Maureen Rush, University of Pennsylvania Chief of Police.

58.     The private party ended around 9:30PM, and approximately ten to twelve individuals remained at the bar another hour or two, including Plaintiff.  At approximately 11:00PM, Plaintiff decided to go home, though other individuals remained at the restaurant.

59.     After exiting the restaurant, Plaintiff began walking toward Market Street, which is a central location to hail a cab or pick up an Uber.  While walking toward Market Street, Plaintiff decided to open his Uber App and request a ride.  An Uber Driver arrived a few minutes later.

60.     Uber riders, including Plaintiff, choose to utilize Uber's services as a result of representations of safety.

61.     Plaintiff was standing on the on the South side of Market Street when the Uber Driver pulled up along the sidewalk heading east towards Center City.  Plaintiff got in the front passenger seat of the Toyota Corolla.  The Uber Driver did not know Plaintiff's destination before Plaintiff entered the car.

62.     The Uber Driver asked Plaintiff, "where you going?"  Plaintiff said "Jersey," and the Uber Driver responded, "I am not driving to New Jersey."  Shocked, and aware that Uber drivers are supposed to take individuals to their requested destination, Plaintiff asked again to be taken to his destination.

63.     The Uber Driver then opened the door, exited the vehicle and walked around the back of the car.  The Uber Driver then opened the front passenger door and dragged Plaintiff out of the front seat by his coat collar.  The Uber Driver severely beat Plaintiff and left him in a pool of blood on the pavement in the freezing cold.  The Uber Driver stomped and kicked Plaintiff in the face and head while he was already unconscious, which upon information and belief, is captured on surveillance video.

64.     The Uber Driver immediately fled the scene in his vehicle and remains at large while University of Pennsylvania Police organize efforts to identify him and effect an arrest.  Two bystanders eventually found Plaintiff unconscious on the sidewalk, and they immediately called 911 to have him transported to Presbyterian Hospital.

65.     Plaintiff was transported to the hospital by ambulance, treated for multiple, serious facial injuries, and was discharged on December 23, 2016.   Plaintiff emailed Uber to inform the company that he had been assaulted by one of the company's drivers. Plaintiff briefly explained to the representative what happened the night before.   The Uber representative advised the company was looking into to the matter, to see if the company should "pull the Uber driver off of the street."  The Uber representative also offered to reimburse Plaintiff for the ride that he was billed for but never actually took.

66.     Since that conversation, Plaintiff has not been contacted by Uber.  In addition, upon information and belief, Uber has refused to cooperate with the police in providing information that would assist them in identifying the Uber Driver.

67.     Upon information and belief, the Police contacted Uber throughout the course of their investigations but were deliberately denied access to critical identifying information such as the Uber Driver's name full name, the license plate of his vehicle, VIN number, and his last known location.

68.     Upon information and belief, Uber had full access to and control over the Uber Driver and could have provided this information to the police so that an arrest could be made. Moreover, Uber could have restricted the Uber Driver's access to the App rather than, as it did, permitting him to continue to pick up passengers and conduct business on Uber's behalf.

21

69.     Although Uber claims its drivers as independent contractors, Uber was in an employer-employee relationship with the Uber Driver; it acted as a principal and its drivers, subject to its full control, acted as agents of Uber; and it was in a principal-agent relationship with the Uber Driver.

70.     At all times herein mentioned, the Uber Driver was acting in furtherance of Uber's business enterprise and its financial interests.  It was reasonably foreseeable that drivers while acting in the pursuit of Uber's goals to provide transportation services to the public, would encounter passengers during the course of their duties and, under certain circumstances, would treat customers in an aggressive, unprofessional, and even violent manner.

71.     It was reasonably foreseeable that drivers, to secure the most profitable rides, would seek to deny service to passengers, such as Plaintiff, requesting trips over relatively short distances in favor of passengers and dispatches for passengers seeking to travel longer distances.  Further, it was reasonably foreseeable that, in furtherance of its business, Uber drivers seeking to deny service to passengers whose trips would not generate the highest fares would encounter passengers resistant to being denied service and that drivers in such circumstances could become hostile, aggressive, and react in a violent manner.  It was reasonably foreseeable that drivers while discharging their duties in furtherance of Uber's financial interests, would encounter situations as a result of numerous interactions with passengers. It was foreseeable, under such circumstances, that a driver could react to a passenger in their care with hostility, aggression, and violence.

72.     At all times herein referenced, the Uber Driver was acting in the pursuit of Ubers business goals and in furtherance of its interests.  At no point did Plaintiff agree to the Terms and Conditions to the App, the full text of which was never provided nor read by Plaintiff when creating an account through Uber's App.

## COUNT I
## (NEGLIGENCE, NEGLIGENT HIRING, NEGLIGENT SUPERVISION, AND NEGLIGENT RETENTION)

73.     Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

74.     Uber owed Plaintiff and the general public a duty of reasonable care in the hiring, training and supervision of its drivers.

75.     Uber did breach that duty of care in the hiring, retention and/or supervision of the Uber Driver, who was unfit to be providers of transportation, and who was not adequately trained or supervised in their driving and conduct with customers.

76.     Uber knew or should have known that he would be a danger to passengers and lead to a risk of the very type of danger and harm that occurred on December 22, 2016.

77.     As a direct and proximate result of the negligence, carelessness, recklessness, and unlawfulness of Uber, Plaintiff sustained serious injuries.

78.     Uber knew or should have known that its negligence and breach of duty of care would cause or had a substantial probability of causing severe emotional distress to Plaintiff, and in fact did cause Plaintiff severe emotional distress and severe physical harm.

79.     Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

## COUNT II
## (FRAUD)

80.     Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

81.     Uber made intentional misrepresentations of fact to Plaintiff known by Uber to be false, to wit, that Plaintiff would be safely taking Uber rides with drivers whose backgrounds had

been screened by Uber, and who would provide them with safe passages, but who, in reality, Uber had not screened in any meaningful way, and who were grave threats to Plaintiff's safety and well-being.

82.     Uber made these misrepresentations to Plaintiff despite knowing that it had not adequately screened its drivers.

83.     Uber's false statements concerning its safety measures detailed herein were made knowingly, or with a willful, wanton and reckless disregard for the truth, and intended to deceive and defraud Plaintiff into agreeing to utilize Uber's services.

84.     Uber made these misrepresentations with the intent to cause Plaintiff to rely on this false information and induce his into utilizing Uber's services, in spite of the concerns Plaintiff had about safety.

85.     As a result of Uber's deliberate misrepresentations of material facts, Plaintiff suffered significant damages.

86.     Uber engaged in fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff, so as to warrant the imposition of punitive damages.

87.     Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

### COUNT III
### (Negligent misrepresentation/Non-Disclosure)

88.     Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

89.     By engaging in intentional acts and omissions alleged in the complaint, Uber has made misrepresentations to and defrauded Plaintiff.

24

90.     Uber intended that Plaintiff would rely on the material misrepresentations and omissions to his detriment.  Uber acted willfully, knowingly, and/or recklessly with respect to the acts and omissions set forth above.

91.     Plaintiff reasonably relied upon the misrepresentation of Uber to Plaintiff's detriment.  Plaintiff suffered injury and damages as result of such fraud.

92.     Uber concealed and suppressed and/or omitted material facts regarding the transportation services provided to Plaintiff.

93.     As a direct and proximate cause of Uber's misrepresentations, omissions, and concealment of the truth, Plaintiff has been damaged and will continue to suffer damages.

### COUNT IV
### (PAUTP-CPL—73 Pa. Cons. St. § 201-1 et seq.)

94.     Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

95.     Uber's transactions and business interactions with Plaintiff and other Pennsylvania customers are subject to the requirements of Pennsylvania law, including the PAUTP-CPL, 73 Pa. Cons. St. § 201-1 et seq.

96.     The PAUTP-CPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Cons. St. § 201-2(4).

97.     The PAUTP-CPL also prohibits (1) "[k]nowingly misrepresenting that services, replacements or repairs are needed if they are not needed"; and (2) "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. St. § 201-2(4)(xv), (xxi).

98.     As a result of Uber's violations of the PAUTP-CPL, Plaintiff has suffered ascertainable losses and damages.

25

99.     Plaintiff is entitled to relief for Uber's violations of the PAUTP-CPL, including but not limited to actual damages, statutory damages of $100 per violation, treble damages, costs, attorneys' fees, injunctive relief, declaratory relief, and additional legal or equitable relief as necessary or proper. *See* Pa. Cons. St. § 201-9.2

## COUNT V

## (VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT)

100.    Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

101.    The conduct described above constitutes violation of the New Jersey Consumer Fraud Act, ("NJCFA") N.J.S.A. § 56:8-1 et. seq.

102.    Uber engaged in concealment, suppression, or omission in violation of N.J.S.A. § 56:8-1 in selling and advertising services under false pretenses.

103.    Uber engaged in the concealment, suppression, or omission of the aforementioned material facts with the intent that Plaintiff and/or the general public would rely upon the concealment, suppression, or omission of such material facts.

104.    Plaintiff would not have used Uber's services had he known or become informed of the material misrepresentations by Uber.

105.    Uber's concealment, suppression, or omission of material facts as alleged herein constitute deceptive and fraudulent business practices within the meaning of N.J.S.A. § 56:8-1 et. seq.

106.    As a direct and proximate result pf Uber's conduct, Plaintiff has suffered damages and ascertainable loss for which Uber is liable to Plaintiff, plus attorneys' fees and costs, along with equitable relief prayed for herein in this Complaint.

## COUNT VI
## (BATTERY)

107.    Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

108.    The violent acts committed against Plaintiff by Uber's employee while performing his job duties amounted to a series of harmful and offensive contacts to Plaintiff's person, all of which were done intentionally and without Plaintiff's consent.

109.    Uber is liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

110.    Uber is a transportation carrier who must carry passengers safely. As a transportation carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.

111.    Transportation carrier carriers must use the highest care and vigilance of a very cautious person.  Uber breached its duty of care in its actions towards Plaintiff.

112.    As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.

113.    As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages.

114.    Uber engaged in fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff herein, so as to warrant the imposition of punitive damages.

115.    Accordingly, Plaintiffs is entitled to recovery against Uber in an amount to be determined at trial.

## COUNT VII
## (ASSAULT)

116.     Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

117.     The violent acts committed against Plaintiff by Uber's employee he was performing his job duties, amounted to a series of events creating a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person, all of which were done intentionally and without Plaintiff's consent.  Uber is liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

118.     Uber is a transportation carrier that must carry passengers safely. As a transportation carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment. Transportation carriers must use the highest care and have the vigilance of a very cautious person.

119.     As a direct and proximate result of the aforementioned conduct, Plaintiff has sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation.  As a direct and proximate result of the aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages.

120.     Uber engaged in with fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff, so as to warrant the imposition of punitive Damages.

121.     Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

## COUNT VIII
## (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

122.    Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

123.    Uber's employee, while carrying out his job duties, engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society.

124.    Uber is liable for the actions of its agents and employees directly and under the doctrine of respondeat superior.

125.    Uber is a transportation carrier who must carry passengers safely and must use the highest care and have the vigilance of a very cautious person.

126.    Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment.

127.    Uber breached its duty of care in its actions towards Plaintiff.  Uber's employee intended to and did intentionally and recklessly cause Plaintiff to suffer severe emotional distress.

128.    As a direct and proximate result of Uber's employees' conduct, Plaintiff has suffered, and continue to suffer, severe emotional distress, for which he is entitled to an award of damages.  The aforementioned events took place due to the negligent acts and/or omissions of Uber and its agents, servants, employees and or licensees, all of whom were acting within the scope of their authority, within the scope of and in furtherance of their employment, and in furtherance of their agency.

129.    By reason of Uber's negligent conduct, Plaintiff suffered serious emotional distress. As a result of Uber's negligent conduct, Plaintiff has suffered and continue to suffer injuries and damages.

130.    Uber engaged in fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff, so as to warrant the imposition of punitive damages.

131.    Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in their favor and against Uber, containing the following relief:

1.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all physical, monetary and/or economic harm; for harm to his professional and personal reputations and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for mental anguish and physical injuries; all other monetary and/or non-monetary losses suffered by Plaintiff;

2.  An award of punitive damages;

3.  An award of costs that Plaintiff have incurred in this action, as well as reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

4.  Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully Submitted,

Dated:  January 5, 2017

/s/

Matthew A. Luber (Pa. Id. No. 309323)
mal@njlegal.com
R. Armen McOmber, Esq. (*pro hac vice to be filed*)
ram@njlegal.com
McOmber & McOmber, P.C.
30 S. Maple Avenue
Marlton, New Jersey 08053
Phone: 856-985-9800
Fax: 732-530-8545

*Attorneys for Plaintiff*