**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH FUSCO,** | : | **CIVIL ACTION** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 17-00036** |
| | : | |
| **UBER TECHNOLOGIES, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

**Goldberg, J.**                                                              **July 27, 2018**

## <u>MEMORANDUM OPINION</u>

Plaintiff Joseph Fusco has sued Defendant Uber Technologies, Inc. in connection with an alleged attack by one of Defendant's drivers while Plaintiff was a passenger. Plaintiff asserts a negligent hiring claim, fraud and related misrepresentation claims, and claims for vicarious liability based on respondeat superior.

Defendant has moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. For the reasons described below, Defendant's Motion will be granted. However, I will give Plaintiff leave to amend his negligent hiring, fraud, and misrepresentation claims.

1

I.      **BACKGROUND**

Plaintiff's Complaint sets forth the following facts:[1]

Defendant markets a service that "allows consumers to request a taxi-like ride with the push of a button on a smartphone." To use the service, a customer enters a destination and pickup location into Defendant's smartphone application ("the app"). One of Defendant's drivers then "accepts" the ride, meets the customer at the pickup location, and takes the customer by car to the destination. The app charges the customer's credit card for the ride, giving a portion of the fare to the driver and a portion to Defendant. (Compl. ¶ 1.)

Plaintiff's claims stem from an injury he suffered while attempting to use Defendant's service to travel from Philadelphia, Pennsylvania to his home in Cherry Hill, New Jersey. During the evening of December 22, 2016, Plaintiff attended a private party in the University City neighborhood of Philadelphia. Plaintiff consumed alcohol at the party, and planned to take a ride home rather than risk driving. At approximately 11:00 p.m., Plaintiff used Defendant's app to procure a ride from Philadelphia to his home in Cherry Hill. (Id. ¶¶ 4-5, 56-59.)

When a driver arrived at the pickup location, the driver did not know Plaintiff's destination. This is because Defendant's app conceals the customer's destination from available drivers until the start of the trip, in order to prevent drivers from declining routes they deem less profitable. For the same reason, Defendant does not allow drivers to refuse a trip after learning where the customer wants to travel. (Id. ¶¶ 5 n.2, 20.)

_____

[1] When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). I assume that all the facts found in the Complaint are true.

After sitting down in the passenger seat, Plaintiff asked the driver to take him to Cherry Hill, New Jersey. The driver, for reasons not specified in the Complaint, refused, and demanded that Plaintiff exit the vehicle. Plaintiff, mindful of Defendant's policy and intent on reaching Cherry Hill, remained seated, and reiterated his request to drive to New Jersey. The driver then stood up, walked to the vehicle's passenger side, and dragged Plaintiff from the vehicle. The driver threw Plaintiff to the pavement, kicking and beating him, breaking multiple bones and teeth. The driver then sped away in the car, leaving Plaintiff unconscious on the sidewalk in a pool of blood, his body half in the street. The driver is unidentified in Plaintiff's Complaint. (Id. ¶¶ 5-7, 61-64.)[2]

In support of Plaintiff's fraud claims, the Complaint sets out excerpts from Defendant's promotional materials concerning the safety of its service. These statements largely fit into one of three categories.

The first category pertains to background checks that Defendant performs on prospective drivers:

- Defendant has "background checks you can trust;"

- Defendant has a "robust system of pre-screenings of drivers;"

- Defendant "thoroughly screen[s]" each driver "through a rigorous process [Defendant has] developed using constantly improving standards;"

- This process includes "a three-step criminal background screening for the U.S.— with county, federal and multi-state checks that go back as far as the law allows— and ongoing reviews of drivers' motor vehicle records;" and

---

[2] Plaintiff's counsel revealed at oral argument that, although he did not know the driver's identity at the time of filing the Complaint, he has since learned this information. (N.T. 6/11/2018 at 13.)

- All drivers "are required to undergo a screening process, like motor vehicle record and background checks, to ensure safety and compliance with [Defendant's] criteria."

(Id. ¶¶ 3, 52-53.)

A second category of statements describes safety or quality more generally:

- At Defendant's company, "safety has always been a top priority;"

- Defendant "take[s] [its] commitment [to safety] very seriously;"

- Defendant's "mission is to connect riders to reliable transportation, everywhere for everyone;"

- Defendant's service offers "a reliable ride to a safe destination;"

- Defendant's service is "[t]he best way to get wherever you're going;"

- Defendant "uses technology to keep drivers and riders safe;"

- Defendant uses customer feedback to "make every ride a 5-star experience;" and

- "Safety first . . . ."

(Id. ¶¶ 3, 53.)

A final category of statements relates not to Defendant's service specifically, but to the social benefit of ride-sharing in reducing drunk-driving fatalities:

- Defendant "partnered with the Mothers Against Drunk Driving . . . to raise awareness about safer ways to get home;" and

- Defendant "partnered with 'Breathometer,' a smartphone breathalyzer, to combat drunk-driving."

(Id. ¶ 53.)

Plaintiff alleges that at least some of the above statements were false, misleading, or amounted to omissions or concealment. The Complaint does not specify which statements from the above list were false, but states that:

4

> [Defendant] . . . intentional[ly] misrepresent[ed] . . . that Plaintiff would be safely taking Uber rides with drivers whose backgrounds had been screened by Uber, and who would provide [him] with safe passages, but who, in reality, Uber had not screened in any meaningful way, and who were grave threats to Plaintiff's safety and well-being.

(Id. ¶ 81.) Plaintiff also alleges that Defendant's "claim of safety is a complete and total sham," that Defendant does not "adequately screen[] its drivers," and that Defendant "mislead[s] the public about the safety and security measures it employs for rider safety." (Id. ¶¶ 3, 8, 43-44, 66, 81-83, 90.)

According to Plaintiff, Defendant contracted with Checkr, Inc. ("Checkr") for background screening services, and Checkr "merely identifies addresses matching any convictions to screen Uber drivers." Defendant's driver application process "is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance." To become a driver, an applicant need only "be at least 21 years of age, have at least one year of driving experience, have a valid US driver's license, have an eligible 4-door vehicle, . . . have proof of vehicle registration and insurance, and complet[e] . . . online screening." As a result, "almost anyone can be an Uber driver," and "Uber employs more than a million drivers." The Complaint alleges that by accepting drivers with only minimal screening, Defendant is able to expand its labor pool and so generate more revenue from ride fares. (Id. ¶¶ 16-17, 46-49, 51.)

The Complaint also lists safety measures that Defendant allegedly chose not to employ. These include: (1) verifying vehicle ownership, (2) verifying drivers' identities by inspecting personal documents, (3) taking fingerprints or biometric scans, or (4) conducting follow-up background checks. (Id. ¶ 50.)

5

Defendant's practice of promoting its service to intoxicated customers allegedly exacerbates safety risks by putting vulnerable passengers in the car with unreliable drivers. Also, Defendant's policy of concealing destinations and then compelling drivers to accept rides allegedly frustrates drivers and provokes fights. The Complaint lists examples of prior incidents in which Defendant's drivers attacked passengers. (Id. ¶¶ 2, 55, 71, 40-42.)

Plaintiff brings claims under multiple theories: negligent hiring, retention, and supervision of the violent driver (Count I); common law fraud and negligent misrepresentation (Counts II-III); statutory consumer fraud under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Cons. Stat. § 201-1 et seq., and the New Jersey Consumer Fraud Act ("NJCFA"), N.J. Stat. Ann. § 56:8-1 et seq. (Counts IV-V); and battery, assault, and intentional infliction of emotional distress under a theory of respondeat superior (Counts VI-VIII). Plaintiff seeks compensatory damages, punitive damages, attorneys' fees, and costs. (Id. ¶¶ 73-131.)

Defendant has moved to dismiss Plaintiff's Complaint in its entirety for failure to state a claim. As to Plaintiff's negligent hiring claims, Defendant argues that dismissal is warranted because Plaintiff has not alleged past misbehavior by the driver that would put a reasonable employer on notice of the driver's propensity for violence. Regarding Plaintiff's misrepresentation claims, Defendant asserts that its marketing statements were statements of opinion or "puffery" that do not amount to false representations of fact. Finally, as to Plaintiff's claims that rest on a theory of respondeat superior, Defendant urges that the driver's conduct was too extreme and erratic to fall within the driver's scope of employment.

Plaintiff responds that he should not be required to set forth detailed allegations of the driver's past misconduct at the pleading stage. Alternatively, Plaintiff seeks leave to amend his Complaint to incorporate newly-discovered facts relating to the driver's criminal record. Plaintiff also argues that Defendant's alleged false statements were measurable characteristics of its service and are therefore actionable. And, as to the respondeat superior claims, Plaintiff asserts that the driver's attack was a foreseeable consequence of Defendant's business practices, and not so erratic as to preclude a factfinder from considering whether it fell within the driver's scope of employment.

For the reasons that follow, I conclude that Plaintiff's negligent hiring, retention, and supervision claims lack sufficient factual allegations to raise a plausible inference of liability. I will, however, provide Plaintiff an opportunity to amend his Complaint to incorporate newly-discovered facts. As to the misrepresentation claims, I conclude that the alleged false statements were puffery and therefore nonactionable, but will grant leave to amend these as well. Finally, as to Plaintiff's claims that rest on a theory of respondeat superior, I conclude that Plaintiff's allegations do not raise a plausible inference that the driver was acting within the scope of his employment, and also that the attack, as alleged, was sufficiently brutal to preclude vicarious liability as a matter of law.

## II.     STANDARD OF REVIEW

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id. To determine the sufficiency of a

complaint under <u>Twombly</u> and <u>Iqbal</u>, a court must take the following three steps: (1) the court must "take note of the elements a plaintiff must plead to state a claim;" (2) the court should identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth;" and (3) "where there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." <u>Burch v. Milberg Factors, Inc.</u>, 662 F.3d 212, 221 (3d Cir. 2011) (alterations and citations omitted). Plaintiff's claims are analyzed below under this standard.

## III.    ANALYSIS

### A.    Negligent Hiring, Retention, and Supervision

Defendant argues that Plaintiff's claims for negligent hiring, retention, and supervision should be dismissed for failure to allege details from the driver's past that would have put a reasonable employer on notice of the risk of violence.[3] Plaintiff responds that a general allegation that the driver was unqualified should suffice at the pleading stage, and that detailed factual exploration is more appropriate for summary judgment or trial. Alternatively, Plaintiff asks for leave to amend his Complaint to incorporate newly-discovered facts about the driver's criminal history.

To make out a claim for negligent hiring, a plaintiff must show that an employer, knowing or on notice of an applicant's propensity for misconduct, nevertheless hired the individual and so exposed the plaintiff to danger. <u>Brezenski v. World Truck Transfer, Inc.</u>, 755 A.2d 36, 39-40 (Pa. Super. Ct. 2000). A claim for negligent retention is similar but requires that

---

[3] Defendant states in its Motion, and its counsel confirmed at oral argument, that although it maintains that its drivers are independent contractors and not employees, it is not pressing that position in this Motion but reserves its right to pursue the issue at a later stage. (N.T. 6/11/2018 at 4.)

the employer negligently declined to terminate an employee after learning of a dangerous tendency. <u>Dempsey v. Walso Bureau, Inc.</u>, 246 A.2d 418, 420 (Pa. 1968). To make out a claim for negligent supervision, the plaintiff must show that the employer knew or should have known of a need to supervise the employee, and that, by failing to do so, exposed the plaintiff to the employee's misbehavior. <u>R.A. ex rel. N.A. v. First Church of Christ</u>, (Pa. Super. Ct. 2000).

Under any of these theories, the plaintiff must show that the employee's prior bad acts would have put a reasonable employer on notice of the employee's propensity to injure others. <u>Heller v. Patwil Homes</u>, 713 A.2d 105, 108, (Pa. Super. Ct. 1998); <u>Dempsey</u>, 246 A.2d at 422 (stating the inquiry to be, "what was [the employee's] conduct prior to [the incident] and was it of such nature as to indicate a propensity for violence?"); <u>Gjeka v. Delaware Cty. Cmty. Coll.</u>, No. 2:12-cv-4548, 2013 WL 2257727, at *13 (E.D. Pa. May 23, 2013) (finding that because "[p]laintiff . . . failed to plead any facts indicating that she . . . complained about [the employee's] actions to an appropriate administrator," she had "failed to plead facts satisfying the 'reasonably foreseeable' element of a negligent supervision claim"). It is not enough that the employer assigned its worker to a "sensitive position" from which the employee later harmed a customer. <u>Dempsey</u>, 246 A.2d at 423. Rather, the plaintiff must show facts that distinguish the employee as unusually prone to violence, such that a reasonable employer would have been dissuaded from hiring the individual. <u>Id.</u>

Plaintiff's Complaint does not allege any instances of past misconduct by the driver, and only generally alleges that the driver was unqualified and dangerous. (Compl. ¶¶ 75-76.) A plaintiff must provide sufficient factual allegations to "nudge[] [a] claim[] across the line from conceivable to plausible," and an allegation that is merely "speculative" is insufficient to

progress past the pleading stage. <u>Twombly</u>, 550 U.S. at 568-70. For this reason, federal courts routinely dismiss negligent hiring claims under Rule 12(b)(6) if the plaintiff fails to allege a specific instance of past misconduct. <u>See, e.g.</u>, <u>Search v. Uber Techs., Inc.</u>, 128 F. Supp. 3d 222, 230 (D.D.C. 2015); <u>Lockhart v. Willingboro High Sch.</u>, 170 F. Supp. 3d 722, 738 (D.N.J. 2015); <u>Doe v. Abdulaziz Bin Fahd Alsaud</u>, 12 F. Supp. 3d 674, 681 (S.D.N.Y. 2014). Although Plaintiff alleges that a reasonable employer in Defendant's position would have conducted additional screening before hiring the driver, this allegation does not state a claim for negligent hiring unless it is further alleged that a more thorough screening process would have uncovered signs of violent behavior. (Compl. ¶ 50.) Accordingly, I will grant Defendant's Motion as to Plaintiff's claims for negligent hiring, retention, and supervision.

I note, however, that at oral argument, counsel for both parties advised that, after Plaintiff filed his Complaint, news outlets reported that the driver had a prior criminal conviction. (N.T. 6/11/2018 at 17-18.) Because this fact was not alleged and its legal sufficiency has not been briefed, it would be premature to decide whether such an allegation would permit Plaintiff to state a legally cognizable claim for negligent hiring, retention, or supervision. Therefore, I will grant Plaintiff leave to amend his Complaint as to these claims, and defer consideration of the driver's past conviction until such time as it may be appropriate to do so.

### B.   Common Law Fraud, Negligent Misrepresentation, and Statutory Consumer Fraud

Defendant argues that Plaintiff's claims for common law fraud, negligent misrepresentation, and statutory consumer fraud should be dismissed because its marketing materials are either not alleged to have been false or, to the extent that they are so alleged, those allegations fall into the non-actionable category of sales-talk known as "puffery." After careful

review of the Complaint, I conclude that the representations that are alleged to be false are puffery, and thus not actionable. I will therefore grant Defendant's Motion as to these claims, but provide Plaintiff with an opportunity to amend them.

Plaintiff's first theory, fraud, consists of a knowing (or reckless) material misrepresentation, made with intent that the other party rely on it, who then does so rely, and so proximately suffers injury. Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994). Plaintiff's second theory, negligent misrepresentation, is similar except that the misstatement need not be made knowingly but must be accompanied by a duty to speak truthfully. Id. at 890. Plaintiff's claim for a violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") requires an "[u]nfair method[] of competition" or "unfair or deceptive act[] or practice[]," including, most generally, "[e]ngaging in any . . . fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. Stat. §§ 201-2(4)(xxi), -3. Finally, Plaintiff's claim for a violation of the New Jersey Consumer Fraud Act ("NJCFA") requires an "unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation" or "concealment, suppression, or omission of any material fact" in connection with the sale of goods or services. N.J. Stat. Ann. §§ 56:8-1(c), -2.

These theories are each confined to statements (or omissions) of *fact*, and do not reach the category of exaggerated sales-talk known as "puffery." Klerlein v. Werner, 160 A. 719, 720 (Pa. 1932) (fraud); Commonwealth v. Golden Gate Nat'l Senior Care LLC, 158 A.3d 203, 216 (Pa. Cmwlth. Ct. 2017) (UTPCPL); Rodio v. Smith, 587 A.2d 621, 624 (N.J. 1991) (NJCFA). Whether a statement is puffery is a legal question that may be determined from the allegations in the complaint. Golden Gate Nat'l Senior Care, 158 A.3d at 216.

11

Puffery is defined as "exaggeration or overstatement expressed in broad, vague, and commendatory language." Castrol, Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993). It includes general words of superiority like "good," "superb," and "top-notch," as well as figurative slogans like "Nationwide is on your side" or "You're in good hands with Allstate." Lake v. Unilever U.S., Inc., 964 F. Supp. 2d 893, 908 (N.D. Ill. 2013) ("high-quality," "expert workmanship," "perfect," "magnificent," and "the best"); Oestreicher v. Alienware Corp., 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008) ("superb"), aff'd, 322 F. App'x 489 (9th Cir. 2009); B&M Linen, Corp. v. Kannegiesser, USA, Corp., 679 F. Supp. 2d 474, 482 (S.D.N.Y. 2010) ("topnotch output fit for a 5 star customers [sic]"); Bolus v. Nationwide Prop. & Cas. Co., No. 3:16-cv-00753, 2018 WL 1474669, at *3 (M.D. Pa. Mar. 26, 2018) ("Nationwide is on your side"); Rodio, 587 A.2d at 624 ("You're in good hands with Allstate."). Such terms convey only the seller's opinion that its product is superior, such that no consumer could claim to have justifiably relied on them. Castrol, 987 F.2d at 945. In short, "bald assertions" of superior quality are puffery if they lack detailed claims that could be measured or tested. Am. Italian Pasta Co. v. New World Pasta Co., 371 F.3d 387, 393 (8th Cir. 2004).

Fraud requires a statement that can be proved false. Sanchez v. ASA Coll., Inc., No. 1:14-cv-05006, 2015 WL 3540836, at *9 (S.D.N.Y. June 5, 2015). A plaintiff wishing to bring a fraud claim, therefore, must allege a statement specific enough to be falsifiable, such as that a product works with "any version of AutoCAD" or that it is "safe for . . . consumption by infants." Autodesk, Inc. v. Dassault Systèmes Solidworks Corp., 685 F. Supp. 2d 1001, 1017-18 (N.D. Cal. 2009); Leonard v. Abbott Labs., Inc., No. 2:10-cv-4676, 2012 WL 764199, at *23 (E.D.N.Y. Mar. 5, 2012). By contrast, there is no way to prove that a product is not "good,"

"dependable," or, in the abstract, "safe." <u>Berkebile v. Brantly Helicopter Corp.</u>, 337 A.2d 893, 903 (Pa. 1975) (holding "[Y]ou are assured of a safe, dependable helicopter" to be puffery), <u>Pizza Hut, Inc. v. Papa John's Int'l</u>, 227 F.3d 489, 498 (5th Cir. 2000) (holding "Better ingredients. Better pizza." to be puffery); <u>Moua v. Jani-King of Minn., Inc.</u>, 810 F. Supp. 2d 882, 889 (D. Minn. 2011) (holding "Jani-King is a good business" to be puffery).

A statement of overall quality can constitute an actionable misrepresentation if the statement is phrased in absolute terms. <u>Stiffel Co. v. Westwood Lighting Grp.</u>, 658 F. Supp. 1103, 1115 (D.N.J. 1987). Absolute statements convey the message that a product never deviates from the asserted standard. <u>Hauter v. Zogarts</u>, 534 P.2d 377, 382-83 (Cal. 1975). For example, a claim of absolute safety can be proved true or false by evaluating whether the product can in fact harm the user. <u>Id.</u> at 381 ("Completely Safe Ball Will Not Hit Player" not considered puffery). This is in contrast to a claim that a product is "safe" generally, which is puffery because it conveys only the seller's judgment that the risk is low enough to be called "safe." <u>Allen v. FCA US LLC</u>, No. 6:17-cv-00007, 2017 WL 1957068, at *3 (W.D. Va. May 10, 2017) ("'[Y]ou're surrounded by advanced features designed to keep you safe and secure' . . . [is] mere puffery and as such [is] not actionable."); <u>Stewart v. Electrolux Home Prods., Inc.</u>, No. 1:17-cv-01213, 2018 WL 1784273, at *11 (E.D. Cal. Apr. 13, 2018) ("The only alleged misrepresentation dealing with safety indicates the oven 'provides easy self-cleaning while keeping your family safe.' . . . This is not a quantifiable statement or an absolute characteristic about safety that can be measured.").

Additionally, a statement that compares a general quality—such as safety—between two products is falsifiable if the quality is measurable. Castrol, 987 F.2d at 945-46. Such a statement would be objectively false if the corresponding measurement did not support the claim. E.g., Giles v. Inflatable Store, Inc., No. 1:07-cv-00401, 2009 WL 961469, at *4 (D. Colo. Apr. 6, 2009) (finding claim that a product was "safest" was not puffery, because it implied the product was "the most likely . . . to keep [customers] from harm"). By contrast, bare assertions of quality cannot be falsified in this way: even if the characteristic could be quantified, there is no standard against which to evaluate it. See Vitt v. Apple Comput., Inc., 469 F. App'x 605, 607 (9th Cir. 2012) (statement that computer was "durable" was puffery and did not imply any particular useful lifetime). In sum, in order for a statement of quality to be actionable, it must contain a standard—either through absolute words or a measurable comparison—against which the statement may be tested and thus falsified.

With these principles in mind, I turn to the statements set out in Plaintiff's Complaint. First, I note that not all of the pleaded representations are alleged to have been false. The Complaint does not allege that it was inaccurate for Defendant to say that it had a "system of pre-screenings of drivers," that it "use[d] technology" for safety, that it checked "county, federal and multi-state" records, or that it "review[ed] . . . motor vehicle records" of its existing drivers. (Compl. ¶¶ 52-53.) These representations are not puffery, because they describe specific aspects of Defendant's screening process that could be tested. However, because Plaintiff does not allege that these statements were false, they cannot constitute actionable misrepresentations.

14

Furthermore, although Plaintiff lists additional steps that Defendant could have taken to screen applicants, he does not argue that any were so inherent in the meaning of the word "background check" that the word became misleading in their absence. (Compl. ¶ 50.) Cf. State Bd. of Med. Registration & Examination v. Scherer, 46 N.E.2d 602, 604 (Ind. 1943) (misleading to identify oneself as a "physician" when not licensed as one). While the word "background check" does imply at least some concrete steps to investigate applicants' histories, the Complaint acknowledges that Defendant made some investigatory effort by hiring a third-party vendor to "identif[y] addresses matching any convictions." (Compl. ¶ 47.) The Complaint does not allege that this was not a background check, only that it was not a "meaningful" or "adequate[]" background check. (Id. ¶ 82.) Cf. Ong v. Chipotle Mexican Grill, Inc., 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018) (finding no misrepresentation in a statement that defendant "monitor[ed] . . . food safety" when plaintiff only alleged that the monitoring was not "adequate[]"). The statement that Defendant conducts a background check, therefore, is also not alleged to be false, and thus cannot support Plaintiff's misrepresentation claims.

Plaintiff's Complaint does, however, allege that Defendant made the following false statements: (1) that "Plaintiff would be safely taking Uber rides with drivers whose backgrounds had been screened by Uber, and who would provide [him] with safe passages;" (2) that Defendant's service was "safe[]" and "reliable;" (3) that Defendant employed "background checks you can trust;" and (4) that Defendant's background checks were "thorough[]," "rigorous," and "robust." (Id. ¶¶ 3, 9, 52, 81.) The Complaint alleges that these were false because Defendant "had not screened [the driver] in any meaningful way," the driver was a

"grave threat[] to Plaintiff's safety and well-being," and Defendant's "claim of safety [was] a complete and total sham." (Id. ¶ 3, 81.)[4]

Initially, I note that these words—"thorough[]," "rigorous," "robust," "safe[]," "reliable," and "you can trust"—are general terms of quality, not specific characteristics. Thus, without more, these statements are not falsifiable. Even if Plaintiff had alleged that one out of every ten of Defendant's passengers was assaulted or that Defendant's safety record was twice as bad as any competing service, it would still be a matter of opinion whether this risk would be too high to be called "safe." See Kidwell v. Wagoner, No. 2:09-cv-00108, 2010 WL 11507301, at *4 (M.D. Fla. Sept. 10, 2010) (advertisement that trucks were "dependable" and "long-lasting" was puffery even though maintenance problems developed within years). While the likelihood of injury is quantifiable, the level at which it becomes "unsafe" is subjective. Likewise, although Defendant allegedly could have made its screening process more "robust" by reviewing additional records or conducting more probing interviews, it would still be a matter of opinion whether the process would be "robust" enough to merit that general, commendatory term. These words, therefore, fit the general definition of puffery, as they are "exaggeration or overstatement expressed in broad, vague, and commendatory language." Castrol 987 F.2d at 945.

Although Defendant's representation that its service was "safe[]" could be actionable if the statement were absolute, Plaintiff does not argue that Defendant represented its service to be absolutely safe, and, indeed, it would be unreasonable to read the alleged statements in absolute terms. Perfect safety would be so far outside Defendant's control—from random traffic accidents

---

[4] At oral argument, Plaintiff's counsel confirmed that Plaintiff's primary argument for fraud is that Defendant falsely represented that its screening procedures were "thorough[]," "robust," and "rigorous." (N.T. 6/11/2018 at 23, 28-29.)

to erratic attacks by strangers—that, absent express language, it would be unreasonable to infer a representation that customers will suffer no harm while using the service. Likewise, Defendant's representation that it "uses technology to keep drivers and riders safe" does not imply absolute safety, in the same way an automaker does not promise absolute safety by representing that a vehicle uses technology to prevent accidents. (Id. ¶ 3.) See Allen, 2017 WL 1957068, at *3 (holding that statement "[Y]ou're surrounded by advanced features designed to keep you safe and secure" was puffery). Because Plaintiff does not contend that Defendant represented its service's absolute safety, Plaintiff's allegations that he and other passengers suffered attacks at the hands of Defendant's drivers cannot—by themselves—support a misrepresentation claim. (Compl. ¶¶ 41-42.)

Likewise, Defendant's representation that its background check was thorough might be actionable if it included a comparison to competing services—but, again, such a comparison is absent from the Complaint. This distinguishes the allegations in Plaintiff's Complaint from those in other cases relied upon by Plaintiff, in which Defendant's advertisements were found to constitute actionable misrepresentations. For example, in L.A. Taxi Coop., Inc. v. Uber Techs., Inc., 114 F. Supp. 3d 852 (N.D. Cal. 2015), it was held that Defendant's representation that it had "the strictest safety standards possible," that its safety was "best in class" and "industry-leading," and that its background checks were "often more rigorous than what is required to become a taxi driver" did not constitute puffery. Id. at 861. Such statements were factual because they implied that Defendant's service was "measurably safer than a ride provided by a taxi or other competitor service" and that it was "statistically most likely to keep riders from harm." Id. at 861. Whether Defendant's screening was "rigorous" is a matter of judgment, but whether it

was "more rigorous" than those of taxi services could be proved false by showing that Defendant did not employ any screening procedure that taxi services lacked. The other cases relied upon by Plaintiff similarly involve comparisons and not free-standing terms of quality.

Plaintiff also argues that a jury could evaluate whether Defendant's screening process was "rigorous" or "robust" by measuring it against "expert testimony" and "government regulations." (Resp., Doc. No. 9, at 23.) However, Defendant is not alleged to have represented that experts would view its service as safe, or that its screening process conformed to government regulations. Such representations, if made, would not be puffery, because the corresponding testimony or regulations could show that the representations were objectively false. Instead, Defendant is alleged to have represented that its service was "safe," and that its screening process was "rigorous" and "robust." Such general, commendatory statements remain matters of opinion regardless of whether an expert or government agency would disagree with them. See Tylka v. Gerber Prod. Co., No. 96-cv-1647, 1999 WL 495126, at *8 (N.D. Ill. July 1, 1999) (finding that despite plaintiffs' attempt to "quantify . . . and thus falsify" a claim that a product was "nutritious" through "expert testimony," the statement was puffery because it was a "subjective, all encompassing" claim on which no consumer would rely), vacated on other grounds, 211 F.3d 445 (7th Cir. 2000). While factfinders can and do assess whether products are reasonably safe, or professional work reasonably thorough, by reference to external standards proved through expert testimony or government regulations, they do so in the context of claims for negligence, malpractice, or products liability—not claims for fraud, which require a false statement of objective fact.

Based on the foregoing, I find that Plaintiff has not alleged a false or misleading statement or omission of fact. As this is a prerequisite to Plaintiff's claims for fraud, negligent misrepresentation, and statutory consumer fraud, I will grant Defendant's Motion as to these claims. However, as it is conceivable that Plaintiff could amend his Complaint to allege false statements that are not puffery, I will grant leave to amend these claims. If, after reasonable investigation, Plaintiff determines that he may do so in good faith and consistent with the pleading standards set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009), and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), Plaintiff may amend his claims for fraud, negligent misrepresentation, and statutory consumer fraud.

### C.    Respondeat Superior

Defendant asks that Plaintiff's claims that rest on a theory of respondeat superior—those for battery, assault, and intentional infliction of emotional distress—be dismissed for lack of alleged tortious conduct falling within the driver's scope of employment.[5] Plaintiff counters that the attack was a foreseeable result of Defendant's business practices and not so outrageous to preclude a factfinder from considering whether to impose vicarious liability.[6]

---

[5] As before, Defendant is not challenging, for purposes of this Motion, that the driver was an employee, but has reserved its right to press the issue later.

[6] Plaintiff also states in the Complaint that "[a]s a transportation carrier, Uber is vicariously liable for its employees' and agents' intentional and negligent torts, whether or not such acts were committed within the scope of employment." (Compl. ¶ 110.) However, Plaintiff does not pursue this argument in his Response nor does he provide authority for this proposition, so I do not address it.

Plaintiff further argues that Defendant has been designated a "common carrier" and so has a heightened duty to protect its passengers. See Connolly v. Philadelphia Transp. Co., 216 A.2d 60, 62 (Pa. 1966). Still, a common carrier is "not an insurer," and Plaintiff must fit his claims into a recognized theory of tort law. Id. Therefore, even if Plaintiff is correct that Defendant is a

An employer is liable for the tortious acts of its employees if committed within the course and scope of their employment. Valles v. Albert Einstein Med. Ctr., 805 A.2d 1232, 1237 (Pa. 2002). An act is within the scope of employment if: (1) it is of a kind and nature that the employee is employed to perform; (2) it occurs within the employee's authorized time and space limits; (3) it is actuated at least in part by a purpose to serve the employer; and (4) if force is used, its use is not unexpected by the employer. Id. at 1241. By contrast, acts done for purely personal reasons or out of "private malice" have no purpose to serve the employer and so are not within the scope of employment. Lunn v. Yellow Cab Co., 169 A.2d 103, 104-05 (Pa. 1961); Fitzgerald v. McCutcheon, 410 A.2d 1270, 1272 (Pa. Super. Ct. 1979) (finding police officer's personal attack on neighbor not within the scope of employment).

An act may be within the scope of employment even though the employer has expressly forbidden it, and even if the act is intentionally violent and causes injury. Potter Title & Tr. Co. v. Knox, 113 A.2d 549, 551 (Pa. 1955); Aliota v. Graham, 984 F.2d 1350, 1359 (3rd. Cir. 1993). However, the rule still holds that the act must have been actuated, at least in part, to serve the employer's purposes. See Aliota, 984 F.2d at 1359 (remanding for a determination of whether defamatory statements, although forbidden, were made to serve the speakers' employer). For example, in Barry ex rel. Cornell v. Manor Care, Inc., No. 2:97-cv-05883, 1999 WL 257663 (E.D. Pa. Apr. 29, 1999), a nurse struck a patient while assisting the patient into bed. Id. at *1. At summary judgment, the court noted that it could not be determined as a matter of law that the assault was for purely personal reasons. Id. at *4. Because the nurse had stated that she used

---

common carrier and so must exercise the highest degree of care, this does not provide an independent ground for sustaining the Complaint.

force to overcome the patient's resistance, it would have been reasonable to conclude that the use of force, although misguided, was designed to facilitate the nurse's work. Id. at *1. Likewise, the Restatement (Second) of Agency suggests that debt collectors may act within the scope of their employment when they use more force than authorized to seize property. Restatement (Second) of Agency § 245 cmt. c, illus. 3 (2010). And, in Lafferty v. Armour & Co., 116 A. 515 (Pa. 1922), a wagon driver acted within the scope of his employment when he struck children with a whip to clear them from his wagon. 116 A. at 515. In each of these examples, the employees took acts that, though criminal and presumably forbidden, were calculated to serve the purpose for which they were employed.

By contrast, in Costa v. Roxborough Mem'l Hosp., 708 A.2d 490 (Pa. Super. Ct.), appeal denied, 727 A.2d 1120 (Pa. 1998), a violent reaction *against* an employer's policy was held to be outside an employee's scope of employment. There, a hospital laundry worker, upset at being questioned about his drug activity on the hospital campus, retaliated by shoving a security guard against a wall. 708 A.2d at 491-92. In a suit by the guard, the court held that the assault was outside the laundry worker's scope of employment, because his conduct was not actuated by a purpose to serve the hospital. Id. at 494. Although the hospital's policy against drug dealing may have caused the employee to act violently, this was only because the employee was lashing out against the policy, rather than trying to enforce it. The scenario in Costa therefore stands in contrast to those cases where employees caused injury by overzealously pursuing their employer's objectives.

Plaintiff's Complaint does not allege how the driver's attack—in which the driver dragged Plaintiff out of the car, kicked him, and beat him—was motivated by a purpose to serve

Defendant. There is only a conclusory statement that all acts were "within the scope of and in furtherance of [the driver's] employment, and in furtherance of [his] agency" and "in furtherance of Uber's business enterprise and its financial interests." (Compl. ¶¶ 70, 128.) In fact, the Complaint alleges a motive for the attack that runs directly counter to Defendant's business purposes: that the driver dragged and beat Plaintiff because he was upset at being forced—by Defendant—to drive to New Jersey. (Id. ¶¶ 5, 71.) This is unlike the Restatement's overzealous debt collectors and more akin to Costa's angry hospital employee. With no allegations of facts that, if true, plausibly suggest that the driver was motivated, at least in part, by a purpose to serve Defendant, Plaintiff has not stated a claim for vicarious liability.

However, even if Plaintiff could allege such facts, there is another reason why the alleged incident cannot trigger liability under a theory of respondeat superior. Under Pennsylvania law, conduct actuated by a purpose to serve the employer may nevertheless fail to create vicarious liability if the act is "so excessive and dangerous, as to be totally without responsibility or reason under the circumstances." Lunn v. Yellow Cab Co., 169 A.2d 103, 104 (Pa. 1961). For example, in Howard v. Zaney Bar, 85 A.2d 401 (Pa. 1952), a bartender, seeing one patron harassing another, pulled out a gun and shot the offender. 85 A.2d at 402. This act, although purportedly serving the bartender's duty to maintain order, was so outrageous under the circumstances that it could not form a basis for vicarious liability. Id. at 403. Similarly, in Spitsin v. WGM Transp., Inc., 97 A.3d 774 (Pa. Super. Ct. 2014), a cab driver kicked and punched a passenger who attempted to flee without paying his fare. 97 A.3d at 776-77. Even though there was "no doubt that part of [the driver's] employment [was] collecting money from customers," the force was so

excessive as to place his conduct outside the scope of employment as a matter of law. Id. at 779-81.[7]

Here, Plaintiff alleges that Defendant's driver "dragged Plaintiff out of the front seat by his coat collar and severely beat Plaintiff, breaking multiple[] bones on his face, knocking out teeth, and leaving him in a pool of blood on the pavement," and that the driver "stomped and kicked Plaintiff in the face and head while he was already unconscious." (Compl. ¶ 5.) These allegations are similar to and at least as outrageous as the ones in Spitsin, which also involved a cab driver kicking a passenger on the ground. Therefore, even if it were possible to read Plaintiff's Complaint as alleging a purpose to serve Defendant, the brutality of the beating takes the act outside the scope of employment as a matter of law. I will therefore grant Defendant's Motion as to Plaintiff's claims for vicarious liability, and, because any amendment would be futile in light of the clear egregiousness of the attack, I will dismiss these claims with prejudice. See Budhun v. Reading Hosp. & Med. Ctr., 765 F.3d 245, 259 (3d Cir. 2014) ("Amendment would be futile if the amended complaint would not survive a motion to dismiss for failure to state a claim.").

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Complaint fails to state a claim upon which relief can be granted. Accordingly, I will grant Defendant's Motion and dismiss Plaintiff's Complaint in its entirety. Plaintiff may amend his claims for negligent hiring, retention, and supervision, as

---

[7] Spitsin, which was decided at the pleading stage, also shows that, while scope of employment is ultimately an issue of fact, a court may decide it as a matter of law if the outrageous character of the conduct is clear on the face of the allegations. Id. at 779-82.

well as his claims for fraud and related misrepresentation torts, to attempt to cure, if possible, the

deficiencies outlined herein.

An appropriate Order follows.