## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

------------------------------------- X

JOSEPH FUSCO,

         Plaintiff,

  - vs. -

UBER TECHNOLOGIES, INC., RASIER-PA, LLC, UISCE BEATHA, Inc. d/b/a CAVANAUGH'S RESTAURANT and BAR, and MAJOR, C. FULLER,

        Defendants.

------------------------------------- X

**Civil Action No. 2:17-cv-00036-MSG**

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Joseph Fusco ("Plaintiff"), by and through his undersigned attorneys, hereby files the following First Amended Complaint and Jury Demand against Defendant Uber Technologies, Inc. ("Defendant Uber" or "Uber"), Defendant Rasier-PA, LLC ("Defendant Rasier"), Defendant Uisce Beatha, Inc. d/b/a Cavanaugh's Restaurant and Bar ("Defendant Cavanaugh's"), and Defendant Major C. Fuller ("Defendant Fuller") (collectively "Defendants").

## PARTIES

1.    Plaintiff is an adult male and a citizen of New Jersey. Plaintiff is the Director of Public Safety employed by Allied Universal.

2.    Defendant Uber is a Delaware Corporation with its principal place of business at 1455 Market Street, San Francisco, California 94105. Uber operates throughout the United States, including in Pennsylvania, maintaining an office at 7821 Bartram Ave, Philadelphia, PA 19153.

3.    Defendant Rasier is a Limited Liability Company organized and existing under the laws of the State of Delaware. Defendant Rasier is a wholly-owned subsidiary of Defendant Uber and is a mere alter ego or conduit by which Defendant Uber does business in Philadelphia, Pennsylvania. Defendant Raiser and Defendant Uber are referred to collectively as "Uber."

1

4.      Defendant Cavanaugh's is a corporation organized under the Commonwealth of Pennsylvania that operates "Cavanaugh's Restaurant and Bar" located in the University City section of Philadelphia, Pennsylvania.

5.      Defendant Fuller an individual citizen of the Commonwealth of Pennsylvania and, at all relevant times herein, was acting as an agent and/or employee of Uber.

## JURISDICTION AND VENUE

6.      The jurisdiction of this action arises under diversity of citizenship, which is codified pursuant to 28 U.S.C. § 1332.  Plaintiff is a citizen of New Jersey and Uber is a citizen of California.  This action involves an amount in controversy in excess of $75,000.00, exclusive of interest and costs.

7.      The Court has personal jurisdiction because Uber conducts business in Pennsylvania and the transactions and occurrences that give rise to this lawsuit took place in Pennsylvania.

8.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b) because Uber conducts business in this District and the transactions and occurrences that gives rise to this lawsuit took place in this District.

## BACKGROUND

**A.      Uber Generally**

1.      Defendant Uber is a global online transportation company headquartered in San Francisco, California.  Defendant Uber is the creator and provider of the Uber app ("App"), a downloadable software application that allows consumers to request a taxi-like ride with the push of a button on a smartphone.

2.      Once a consumer requests a ride, a nearby Uber driver "accepts" the request and the App displays an estimated time of arrival for the Uber driver to arrive at the consumer's pickup location.  The App also notifies the consumer when the driver is about to arrive and it provides general information about the driver (e.g., first name, vehicle type, and license plate number).

3.      The rider then enters the preferred destination, which the rider can do before or during the ride.  Upon arriving at a destination, the rider exits the vehicle and the fare is automatically calculated and charged to the payment method linked to the rider's Uber account—typically a credit card.[1]

4.      At first blush, Uber's electronic hailing platform sounds fantastic.  From a business perspective, the App eliminates the need for dispatchers and cuts down on wasteful time that full-time cab-drivers might spend driving around looking for fares.

5.      For the consumer, the experience is supposed to be easy and completed entirely through the App.  But a deeper assessment reveals that Uber's service inherently puts consumers at serious risk and that the company has sacrificed rider safety to realize rapid and global expansion.

6.      Even worse, Defendant Uber targets consumers that are either defenseless or in a vulnerable state while falsely telling consumers that the company's service is entirely safe.

7.      Despite its representations, advertising, and promotional materials, Uber cannot assure riders of the safety of the driver behind the wheel.

8.      To the contrary, Uber's services put consumers at an increased risk.  The number of reported incidents speak for themselves.  *See* http://www.whosdrivingyou.org/rideshare-incidents.

---

[1] Uber keeps a percentage of the fare paid by the rider.

9.      Uber is rapidly expanding because almost *anyone* can be an Uber driver, which is a central part of the company's marketing scheme.  As shown on the company's website:



**Make good money.** Got a car? Turn it into a money machine. The city is buzzing and Uber makes it easy for you to cash in on the action. Plus, you've already got everything you need to get started.



**Drive when you want.**
Need something outside the 9 to 5? As an independent contractor with Uber, you've got freedom and flexibility to drive whenever you have time. Set your own schedule, so you can be there for all of life's most important moments.



**No office, no boss.**
Whether you're supporting your family or saving for something big, Uber gives you the freedom to get behind the wheel when it makes sense for you. Choose when you drive, where you go, and who you pick up.

10.     Upon information and belief, Uber takes a fee ranging between twenty and thirty percent of every ride charged to customers.

11.     Uber holds itself out as nothing more than a technological platform designed simply to enable consumers to have easy access to transportation; the reality is, Uber retains significant control over its driver's provision of transportation.

12.     Upon information and belief, in terms of performing transportation services, Uber maintains strict control over its drivers including, but not limited to, control over optimal routes and travel times, fee arrangements and pricing, and vehicle maintenance requirements.

13.     Failure to follow the mandatory standards leaves drivers subject to poor ratings and reviews, diminished access to fares and a lock-out from the application.  For example, upon information and belief:

4

a.     Uber has the discretion to fire its drivers for any reason and at any time.

b.     Drivers are not charged a fee by Uber to apply to become employees.

c.     Drivers are not charged a fee to download the App to receive notifications of rides requested via the App.

d.     Uber recently announced that drivers will have guaranteed earnings.

e.     Fare prices for rides are set exclusively by Uber and drivers are not permitted to negotiate with customers.

f.     Uber controls its drivers' contact/customer list and drivers are not permitted to book Uber customers unless it is through the App.

g.     Uber requires its drivers to accept all ride requests when the drivers are logged into the App. Drivers that reject too many ride requests risk facing discipline, including suspension or termination.

h.     Uber has a dress code for drivers.

i.     Uber requires drivers to send the customer a text message when the driver is close to the pickup location.

j.     Uber trains drivers on compliance with local regulations, down to the placement of the Uber placard:



k.     Uber dictates the radio stations utilized by drivers.

l.      Uber requires drivers to open the door for the customer and to pick up the customer on the correct side of the street.

m.      Drivers who accept trip requests are required to bring the driver to the preferred destination.

**B.    Uber Is a Public Transportation Carrier, Not Merely a Technology Company**

14.     Because Uber transports persons for profit, Uber's operation has been challenged by governments and taxi companies.

15.     Uber drivers are commonly referred to as "pirate taxies" that present unfair competition to taxis.

16.     Pennsylvania's Public Utility Commission ("PUC") regulates motor carriers that transport property and passengers in Pennsylvania for compensation.

17.     66 Pa. C.S. §102 defines the term "public utility", in pertinent part, as follows: "(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for: … (iii) Transporting passengers or property as a common carrier."

18.     66 Pa. C.S. §102 defines the term "common carrier" as follows: "Any and all persons or corporations holding out, offering, or undertaking, directly or indirectly, service for compensation to the public for the transportation of passengers or property, or both, or any class of passengers or property, between points within this Commonwealth by, through, over, above, or under land, water, or air, and shall include forwarders, but shall not include contract carriers by motor vehicles, or brokers, or any bona fide cooperative association transporting property exclusively for the members of such association on a nonprofit basis."

19.     In June 2014, Uber applied to the PUC for authority to operate as a motor common carrier of persons.

20.    In early 2015, the PUC granted ridesharing companies, including Uber, licenses that allow them to operate throughout Pennsylvania, but the services continued to be illegal in Philadelphia due to the Philadelphia Parking Authority's ("PPA") exclusive regulatory authority in the city. Uber continued to operate in Philadelphia despite the lack of explicit authority. *See Application of Rasier-PA LLC*, Docket No. A-2014-2416127 (Dec. 5, 2014), *reconsideration denied*, Docket No. A-2014-2416127 (Jan 29, 2015).

21.    In April 2016, the Pennsylvania Commonwealth Court affirmed the PUC's grant of a certificate of public convenience for authority to operate as a common carrier to Raiser-PA, LLC ("Raiser") in Pennsylvania, excluding Philadelphia. Raiser is a local subsidiary of Uber.

22.    Raiser requested that the PUC approve of its services in June 2014, although Uber had been illegally operating in Pennsylvania since February 2014, for which the PUC fined Uber approximately $11,000,000. The PUC approved Raiser's application to operate as a common-carrier on December 5, 2014.

23.    In October 2016, Philadelphia Court of Common Pleas Judge Linda Carpenter issued a cease and desist order against Uber, which is the result of application for a restraining order filed by Philadelphia's taxicab alliances.

24.    On November 4, 2016, Pennsylvania enacted Senate Bill 984, which established a basic regulatory framework for the operation of transportation network companies in every county in Pennsylvania and for regulation by the PUC.

25.    This legislation sets minimum standards to ensure transportation network companies operate safely and responsibly. For example, companies and drivers are required to maintain proper insurance coverage, meet vehicle safety requirements, report accidents, and there is a zero-tolerance policy on the use of drugs or alcohol for a driver using the digital network.

26.     The also prevents individuals convicted of certain crimes, including burglary, robbery and sexual offenses, from offering transportation network services.     *See* ttp://www.legis.state.pa.us/cfdocs/legis/li/uconsCheck.cfm?yr=2016&sessInd=0&act=164.

27.     Because Uber's drivers use their vehicles for personal and public transportation—which is prohibited for common carries—the legislature has a created a new definition for transportation network companies, "Dual motor carrier":

> **"Dual motor carrier":** A call or demand carrier operating under a certificate of public convenience and providing transportation network services pursuant to a license from the commission. For purposes of this chapter, only certificated call or demand carriers may file an application with the commission requesting a license to operate a transportation network service as a dual motor carrier.
>
> **"Dual motor carrier driver."** An individual who:
>
> (1) receives connections to potential passengers and related services from a dual motor carrier in exchange for payment of a fee to the dual motor carrier; and
>
> (2) uses a personal vehicle to offer or provide a prearranged ride to passengers upon connection through a digital network controlled by a dual motor carrier in return for compensation or payment of a fee.

28.     Despite Uber's claim that it is merely a transportation broker and Pennsylvania's recent legislation that allows Uber drivers to use vehicle public and personal transportation, Uber's driver operates no differently than a common carrier when servicing consumers.[2]  In Pennsylvania, it is a well-settled principle that public transportation carriers are responsible for exercising a high degree of care to protect passengers.

---

[2] *E.g., O'Connor v. Uber Technologies, Inc.*, 82 F. Supp. 3d 1133, 1141-42 (N.D. Cal. 2015) ("Uber does not simply sell software; it sells rides. Uber is no more a 'technology company' than Yellow Cab is a 'technology company' because it uses CB radios to dispatch taxi cabs. ... however, the focus is on the substance of what the firm actually does (e.g., sells cab rides), it is clear that Uber is most certainly a transportation company, albeit a technologically sophisticated one.").

## PLAINTIFF IS OVER-SERVED ALCOHOLIC BEVERAGES IN VIOLATION OF PENNSYLVANIA'S DRAM SHOP ACT AND IS SEVERELY INJURED BY AN UBER DRIVER, DEFENDANT FULLER

29.     On December 22, 2016, Plaintiff attended a private holiday party with colleagues. Plaintiff knew that alcohol would be served at the party.

30.     Rather than risk drinking and driving, Plaintiff took a train into Center City Philadelphia from his home in Southern New Jersey.   Plaintiff planned to utilize Uber's services for his ride home.

31.     Uber riders, including Plaintiff, choose to utilize Uber's services as a result of the company's representations regarding safety, driver training, vetting, and screening.

32.     Specifically, Plaintiff took the Market-Frankford train line to University City District of Philadelphia.  Once there, Plaintiff met a colleague to walk to Defendant Cavanagh's, which is located on S. 39th St., Philadelphia, PA.

33.     Plaintiff then attended a private party with other employees of Allied Universal and other prominent local safety officials.

34.     At all relevant times, Defendant Cavanaugh's sold and/or dispensed alcoholic beverages to consumers, including to Plaintiff on the night of December 22, 2016.

35.     Defendant Cavanaugh's was the owner of a liquor license, purchased with the approval of the Pennsylvania Liquor Control Board ("PLCB"), and sold/dispensed alcoholic beverages under regulations imposed by the PLCB and the Pennsylvania Statutes Title 47 Chapter 1 Liquor Code.

36.     In addition, Defendant Cavanaugh's, through its agents, servants, workers, and employees, willfully and unlawfully served and continued to serve alcoholic beverages to Plaintiff when he was in a visibly intoxicated condition, in direct violation of the Pennsylvania Dram Shop

Act, 44. P.S. 4-493 et. Seq., when it knew, or had reason to know, that Plaintiff was at risk of harm and unable to self-protect.

37.    Pennsylvania recognizes an action for brought by an injured intoxicated patron or customer.

38.    Generally, section 4-493 of the Pennsylvania Liquor Code makes it unlawful for a licensee to serve a patron who is visibly intoxicated.

39.    Section 4-493 was enacted not only to protect society in general, but also to protect intoxicated persons from their inability to exercise self-protective care.

40.    Plaintiff was lawfully on the premises of Defendant Cavanaugh's consuming alcoholic beverages served to him by employees who were acting within the scope of their authority on the evening of December 22, 2016 and immediately prior to Plaintiff being assaulted.

41.    While on the premises of Defendant Cavanaugh's, Plaintiff was in a visibly intoxicated condition, though Defendant Cavanaugh's employees continued to serve him alcohol, which is in direct violation of the Pennsylvania Dram Shop Act, 44 P.S. 4-493 *et. seq.*

42.    Defendant Cavanaugh's employees knew, or had reason to know, that Plaintiff, was at risk of harm by virtue of him being intoxicated.

43.    The private party at Defendant Cavanaugh's ended around 9:30PM, and approximately 10 to 12 individuals remained at the bar for another hour or two, including Plaintiff.

44.    At approximately 11:00PM, Plaintiff decided to go home, though other individuals remained at the restaurant.

45.    After exiting the restaurant, Plaintiff began walking toward Market Street, which is a central location to hail a cab or pick up an Uber ride.  While walking toward Market Street, Plaintiff decided to open his Uber App and request a ride, which arrived a few minutes later.

46.     Plaintiff was standing on the on the South side of Market Street when the Uber driver, Defendant Fuller, pulled up along the sidewalk heading east towards Center City. Plaintiff got in the front passenger seat of the Toyota Corolla.

47.     Pursuant to Uber policy, Defendant Fuller did not know Plaintiff's destination before Plaintiff entered the car.

48.     Once in the vehicle, Plaintiff explained to the Defendant Fuller that he would like to be taken to his residence in Cherry Hill, New Jersey.[3]   Specifically, when Defendant Fuller asked Plaintiff, "where you going?," Plaintiff said "Jersey." Defendant Fuller responded, "I am not driving to New Jersey."

49.     Plaintiff was shocked, as he was aware that Uber drivers are supposed to take individuals to their requested destination.

50.     In other words, upon learning Plaintiff's destination, Defendant Fuller refused service and demanded that Plaintiff "get out" of the vehicle.  Due to his impaired state and desire for a safe ride home, Plaintiff asked again to be taken to his desired destination.

51.     Without warning or explanation, Defendant Fuller then exited the driver's seat, walked around the back of the car, and opened the front passenger door.

52.     Defendant Fuller dragged Plaintiff out of the front seat by his coat collar, and severely beat Plaintiff, breaking multiples bones on his face, knocking out teeth, and leaving him in a pool of blood on the pavement (with his body partially in the street).

53.     Defendant Fuller stomped and kicked Plaintiff in the face and head while he was already unconscious, which upon information and belief, is captured on surveillance video.

---

[3] Upon information and belief, Uber drivers must accept all ride requests when they are logged into the App and the driver is not necessarily privy to the rider's destination.  This is to ensure that a driver will not refuse a ride based upon destination or because it is not an ideal fare.

54.     Defendant Fuller immediately fled the scene in his vehicle, leaving Plaintiff in a pool of blood on the pavement in the freezing cold.

55.     Two bystanders eventually found Plaintiff unconscious on the sidewalk, and they immediately called 911 to have him transported to Presbyterian Hospital.

56.     Plaintiff was transported to the hospital by ambulance, treated for multiple, serious facial injuries, and was discharged on December 23, 2016.

57.     As a result of the assault and battery, which occurred while Defendant Fuller worked under the direct control of Uber, Plaintiff sustained physical and emotional injuries from which he may never fully recover.

58.     Adding insult to injury, Defendant Fuller not only failed to report the incident (to Uber or the authorities), he charged Plaintiff for a 28-minute ride across the city of Philadelphia after leaving Plaintiff for dead.

**From:** Uber Receipts <uber.us@uber.com>
**Date:** December 22, 2016 at 11:44:29 PM EST
**To:** xxxxxx@yahoo.com
**Subject: Your Thursday evening trip with Uber**



## UBER'S NEGLIGENCE

59.    Uber policy dictates that Defendant Fuller *not* be made aware of the rider's destination in advance to ensure drivers "will not refuse a ride based upon destination or because it is not an ideal fare."

60.    Uber implements this policy to force drivers to accept all rides, knowing full-well it has the potential to cause a driver to refuse to accept the ride *after* the passenger is in the vehicle, creating significant inconvenience and aggravation for the rider.

61.    Uber also markets and advertises to consumers that drivers are not permitted to refuse consumer requests for rides and that they are penalized for doing so.

62.    Uber thus has deliberately created a system of drivers who do not know where they are going until after they accept a ride or pick up a passenger.

63.    It is reasonably foreseeable that such a policy will cause problems, create conflicts, and lead to breaches of the peace (by driver, by passenger, or both). *See, e.g.*, https://www.nbcwashington.com/news/local/Uber-Drivers-Stiff-Passengers-After-Finding-Out-Final-Destination-408432315.html

64.    It is reasonably foreseeable that drivers, while acting in the pursuit of Uber's goals to provide transportation services to the public, would be involved in disputes regarding service and that drivers or passengers could become aggressive, unprofessional, and even violent.

65.    It is reasonably foreseeable that drivers will opt out of less lucrative pickups, avoid rides where they spend time driving back from a neighborhood with no pickups, to avoid neighborhoods they perceive as dangerous or more crime-ridden, or simply avoid areas that have fewer potential pickups.

66.     The policy is particularly problematic in the very circumstance in which Plaintiff found himself in December 2016 – needing a ride when it is late at night, when he is intoxicated, and when he "just wants to get home" after consuming alcohol in the city.

67.     While the policy is designed to earn Uber as much money as possible by forcing drivers to accept as many trips as possible, drivers are put in a conundrum – drive a passenger to a destination they do not want to travel or deny the ride after the passenger gets in the car, risking conflict.   Either way, the policy creates an unhappy driver, or unhappy rider, or both.

68.     In fact, to avoid this scenario, upon information and belief, many Uber drivers take matters into their own hands by attempting to contact the passenger prior to arrival to learn of their destination, or starting the trip moments before picking up the passenger simply to see where the passenger is going, or turn their phone to "airplane mode" to disconnect the App. *See* https://www.marketwatch.com/story/new-york-citys-new-uber-rules-could-make-those-5-cancellation-fees-go-away-2018-08-16

69.     Some drivers have gone so far as to hack into the App to gather passenger destination information.

70.     Indeed, Uber representatives have been known to tell drivers to contact the rider to ask them to cancel the ride request. *See, e.g.,* https://lechicgeek.boardingarea.com/uber-support-advises-drivers-ask-destination-ubers-rules-say-otherwise/

71.     This case arises directly out of Defendant Fuller's refusal to drive Plaintiff to his desired destination, Plaintiff reiteration of Uber's policy that required him to do so, Uber's policy of not revealing the destination to Defendant Fuller, Uber's policy of penalizing drivers who decline rides rather connect Plaintiff with the appropriate driver in the first place, Uber's failure to

train drivers on this subject matter, and Uber's failure to provide means and methods to connect with a driver that is willing to travel to the preferred destination.

72.     Just like any taxi cab dispatcher who asks – "where are you going?" – before sending a driver for pick-up, Uber easily could have, and should have, informed Defendant Fuller of Plaintiff's destination in advance.

73.     In the alternative, Uber could have, through its App, dispatched a driver other than Defendant Fuller who desired to drive Plaintiff to his desired destination or a particular area, such as southern New Jersey.

74.     In the alternative, if no such driver was available, Uber could have – like any taxi company – not connected Plaintiff with any Uber driver at all, permitting Plaintiff to obtain a ride from another source, such as a taxi, another ridesharing company, public transportation, or even a friend.

75.     Uber has the technology and the ability to allow drivers and riders to select mutually agreeable trips.  Uber negligently failed to do so in this case and that failure proximately caused Plaintiff's injuries.

76.     Uber also has the technology and the ability to divert passengers to other Uber drivers who are willing to accept passengers regardless of destination or to ensure that the driver is willing to travel to the particular destination.  Uber negligently failed to do so in this case and that failure proximately caused Plaintiff's injuries.

77.     Indeed, upon information and belief, Lyft has a driver and passenger re-matching system currently that swaps out the current driver for another who is close to a passenger's pickup destination.

78.     Upon information and belief, at the time of Plaintiff's assault, Uber had no re-matching system – though it was capable of implementing such a system[4] – or Uber failed to train Defendant Fuller on the use of such system.  Uber's negligence in this regard proximately caused Plaintiff's injuries.

79.     Uber also has a duty to train or supervise drivers on how to handle situations where the driver does not want to travel to a particular destination, or if a consumer is upset when learning a driver is rejecting a ride after originally accepting it.  Uber negligently failed to do so in this case and that failure proximately caused Plaintiff's injuries.

80.     Indeed, upon information and belief, Uber provides no training or supervision on the subject whatsoever, and simply penalizes drivers when it is reported to the company that they denied a requested ride or allows consumers to provide a low rating on the App.

81.     In addition, Defendant Uber's failure to properly screen and conduct background checks, to provide training to drivers, and to provide any real time supervision of drivers proximally caused Plaintiff's injuries.

82.     In Pennsylvania, entities operating public businesses are bound to use reasonable care to select, hire, and retain agents and employees competent and fit for the work assigned to them and to refrain from retaining the services of an unfit agent and/or employee.

83.     Uber had a duty to use reasonable care in the selection, hiring, retention, training, and supervision of its agents and/or employees.

84.     To become a driver for Uber, individuals apply through Uber's website.  The application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, and proof of insurance.  An individual must be at

---

[4] *See, e.g.*, https://www.uber.com/blog/seattle/sea-tac-airport-re-match/

least 21 years of age, have at least one year of driving experience, have a valid United States driver's license, have an eligible 4-door vehicle, and have proof of vehicle registration and insurance, and completion of online screening.

85.     Contrary to Uber's representations to consumers, the application process to become an Uber driver is simple, fast, and designed to allow the Company to hire as many drivers as possible, all at the expense of rider safety—Uber's claimed number one priority.

86.     Despite transporting members of the public and being in a critical position of public safety, upon information and belief, prior to being hired by Uber, Defendant Fuller had no experience or prior employment in the transportation of passengers.

87.     Further, upon information and belief, at all relevant times, Uber used a third-party vendor, Checkr Inc. ("Checkr"), to run security checks on its drivers.   Checkr simply runs a potential drivers' social security numbers through records databases similar to those held by credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions.

88.     In turn, if a potential driver was convicted of a serious crime more than seven years prior to applying to become an Uber driver, Uber would have no way of knowing such a fact.

89.     Thus, when hiring, selecting, retaining, and/or employing Defendant Fuller, Uber did not require him to submit fingerprints for comparison against Department of Justice and Federal Bureau of Investigation databases; did not conduct Live Scan biometric fingerprint background checks of applicants; did not conduct in-person interviews of Defendant Fuller; did not check prior employment or personal references; and did not check employment history or speak with former supervisors.

90.     Thus, upon information and belief, Uber's screening and background check process did not capture Defendant Fuller's prior criminal record.

91.     At a minimum, Uber's background and screening process should have, but did not, picked up Defendant Fuller's prior criminal conviction.

92.     Upon information and belief, in 1984, Defendant Fuller was in involved a violent altercation in Philadelphia, Pennsylvania that resulted in his admission to Chestnut Hill Hospital.

93.     While at the hospital Defendant Fuller was arrested and charged with unlawfully possessing a concealed firearm – a Smith and Wesson revolver – that included five live rounds of ammunition.

94.     Upon information and belief, Defendant Fuller was ultimately convicted of violating 18 Pa.C.S. § 6108, a first-degree misdemeanor:

> **6108.  Carrying firearms on public streets or public property in Philadelphia.** No person shall carry a firearm, rifle or shotgun at any time upon the public streets or upon any public property in a city of the first class unless:
>
> (1)  such person is licensed to carry a firearm; or
>
> (2)  such person is exempt from licensing under section 6106(b) of this title (relating to firearms not to be carried without a license).

95.     Pennsylvania organizes misdemeanors into three basic categories: first, second, and third-degree offenses.  First-degree offenses are the most serious type of misdemeanor with the most significant penalties possible, while third-degree misdemeanors are the least serious.

96.     First-degree misdemeanors, like the one charged against Defendant Fuller, are serious crimes that can result in up to 5-years of incarceration, and, if combined with other potential charges, could result in felony charges.

97.     Defendant Uber should have known that Defendant Fuller had a serious prior criminal record but, upon information and belief, did not due to Uber's deliberately limited screening and background checks.

98.     Had Uber conducted an in-depth background check or conducted any meaningful screening during the interview process prior to hiring to him, Uber would have learned that Defendant had a prior criminal history.

99.     While the conviction in and of itself warranted ineligibility, at a minimum, Defendant Fuller's prior conviction warranted further investigation into his background, additional screening/vetting, and more stringent training prior to allowing him to transport members of the public.

100.    Uber is aware that Plaintiff, and other reasonable consumers, would not have accepted a ride knowing Defendant Fuller had a serious prior criminal conviction, particularly one involving a loaded gun.

101.    Uber was either unaware of Defendant Fuller's prior violent conviction, or was made aware, and failed to take additional precautions such as conducting an in-person interview, reviewing third-party references, or performing a fingerprint background check on Defendant Fuller to determine whether he posed a risk to the safety of Uber riders prior to being hired.

102.    Compounding Uber's trivial screening process is the lack of driver training.

103.    Defendant Fuller was not required to attend training classes on driving skills, harassment or violence, to pass written examinations, road vehicle tests, and/or require drivers to pass vision and hearing exam.

104.    The online Uber application merely concludes with a requirement that the candidate watch a 13-minute video on how to use the Uber App.

105.   Upon information and belief, there is no follow-up training and no driver assessment other than what is reported by consumers on the App's driver rating system.

106.   Plaintiff was Defendant Uber's archetypal customer—an individual looking for a safe ride home after consuming alcohol.

107.   Defendant Uber has repeatedly pointed to drunk-driving reduction as a key benefit of its service.  Defendant Uber realizes it must inform consumers of strong safety measures to induce riders to book a trip with its drivers, particularly after consuming alcohol.  Some common Uber taglines are "Drink Responsibly, Drive with Uber" and "Don't Drink and Drive, Take an Uber Safe Ride."  Adds like these are routinely peddled by Uber:




108.   On its website, Uber refers to a report issued by Temple University professors that claims to show a correlation between decreased alcohol-related driving fatalities and the introduction of Uber services.  Uber states: "At Uber, safety has always been a top priority, and we take that commitment very seriously. We have partnered with Mothers Against Drunk Driving (MADD) and many other valued community stakeholders to build a world where a safe ride is always within reach and drunk-driving is a thing of the past."

109.   Uber's targeting of intoxicated consumers, under the guise of being able to provide a safe ride, only increases the need for driver training and supervision.

110.    Despite heavily marketing to consumers that have consumed alcohol, Uber offered Defendant Fuller no training on how to deal with intoxicated customers.

111.    Despite serious incident after serious incident, Uber offered Defendant Fuller no training on what to do in an emergency situation or how to address disputes between the rider and driver.

112.    Compounding the trivial screening and non-existent training is that, fundamental to Uber's model, the inherent concept is that members of the consuming public will be stepping into the backseat of a stranger's private car with virtually no oversight or protection.

113.    Uber also failed to provide Defendant Fuller any method for him to call the company, or communicate with a dispatcher or supervisor in real time, in the event of a dispute, altercation, or emergency.   Uber negligently failed to do so in this case and that failure proximately caused Plaintiff's injuries.

114.    Had Uber provided supervision, Defendant Fuller, for example, could have contacted the supervisor to intervene to resolve the dispute about Plaintiff's desired destination, to dispatch another Uber driver to the location, to assist Defendant Fuller in addressing/handling an intoxicated passenger, to assist Defendant Fuller in contacting authorities or emergency personal once Plaintiff was injured, among other things.

115.    Uber provides no supervision or oversight of its drivers, including Defendant Fuller.

116.    At the time the events relevant to this case took place, there were no security cameras, no special markings on the cars, no sense of company or authoritative oversight, no dispatchers, no check-ins, and no reporting required.

117.    Once the drivers are selected, retained, and /or employed, they were free to roam as they please.

118.    This is why, after assaulting Plaintiff, Uber was unaware for days that the assault even took place.

119.    It is also why Defendant Fuller remained at large for several weeks while University of Pennsylvania Police organized efforts to identify him and effect an arrest, even though the assault occurred while Defendant Fuller was transporting passengers in furtherance of Uber's business and while utilizing the App.

120.    Indeed, when Plaintiff emailed Uber from the hospital to inform the company that he had been assaulted by one of the company's drivers, the Uber representative advised the company was looking into to the matter to see if the company should "pull the Uber driver off of the street."

121.    The Uber representative also offered to reimburse Plaintiff for the ride because, after assaulting Plaintiff, Defendant Fuller continued to complete Plaintiff's ride as if he was in the car.

122.    This could only happen if the company had a complete lack of oversight over its employees like Defendant Fuller.

123.    Had Uber properly supervised Defendant Fuller, Plaintiff likely would not have been injured at all or, at a minimum, received medical assistance much quicker.

**UBER MADE FALSE AND MISLEADING REPRESENTATIONS TO PLAINTIFF REGARDING CONSUMER SAFETY, BACKGROUND CHECKS, DRIVER VETTING, DRIVER TRAINING, & DRIVER SUPERVISION**

124.    Uber has, and continues to, knowingly mislead the public about the safety and security measures it employs for rider safety.

125.    Riders, including Plaintiff, reasonably relied on Uber's representations and promises about its safety, screening, training, and security measures prior to utilizing the Uber App and/or getting into a vehicle operated by an Uber driver.

126.    Uber 's business model is contingent on convincing its customers it is safe to get into a stranger 's vehicle.  To do this, Uber makes a number of representations on its webpages, in communications with customers, and in the media designed to create the impression that Uber provides what Uber characterizes as the "safest rides on the road."

127.    Examples of misrepresentations made to, and relied upon by consumers, including Plaintiff, are as follows:

   a.  "All Uber [drivers] must go through a rigorous background check that leads the industry;"

   b.  "The Safe Rides Fee supports an industry-leading background check process;"

   c.  "Uber has Background Checks that Exceed any Local or National Standard;"

   d.  "Uber's background check process is often more rigorous than what is required to become a taxi driver;"

   e.  "Uber's safety measures *always* exceed what is required of local taxi companies;"

   f.  "Uber's background checks go back as far as the law allows;"

128.    Courts have recognized that these, and similar representations, are more than mere "puffery"— they constitute literally false statements and statements that are likely to mislead consumers.

129.    More specifically, in 2014, Uber created a specific webpage dedicated to touting the "safety" of riding with Uber.  Uber's website prominently displayed the slogan "SAFEST

RIDE ON THE ROAD – Going the Distance to Put People First" – Uber used and continues to use the URL: www.uber.com/safety.





130.    The paragraph below the depiction provides that: "Wherever you are around the world, Uber is committed to connecting you to the safest ride on the road.  That means setting the ***strictest standards possible***, and then working hard to improve them every day. The specifics

vary depending what local governments allow, but within each city we operate, we aim to go above and beyond local requirements to ensure your comfort and security – what we are doing in the US is an example of our standards around the world."

131.    Uber represented on the same webpage under the tagline "RIDER SAFETY" that "Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using ***industry-leading standards***. This includes a three-step criminal background screening for the U.S. – ***with country, federal and multi-state checks that go back as far as the law allows*** – and ongoing reviews of drivers' motor vehicle records throughout their time on Uber."



### RIDER SAFETY

From the moment you request a ride to the moment you arrive, the Uber experience has been designed from the ground up with your safety in mind

**BACKGROUND CHECKS YOU CAN TRUST**

Every ridesharing and livery driver is thoroughly screened through a rigorous process we've developed using industry-leading standards. This includes a three-step criminal background screening for the U.S. — with county, federal and multi-state checks that go back as far as the law allows — and ongoing reviews of drivers' motor vehicle records throughout their time on Uber

READ MORE

| BACKGROUND CHECKS | NO HAILING | ANONYMOUS FEEDBACK | DRIVER PROFILES |

132.    The "read more" link on the "BACKGROUND CHECKS YOU CAN TRUST" segment of Uber's "Safety" webpage connected readers to an entry on the Uber blog. There, Lane Kasselman, the former head of communications for Uber, made a number of representations

touting the "rigorous" background checks Uber conducts compared to other transportation methods: "All Uber ridesharing and livery partners must go through a rigorous background check… *Screening for safe drivers is just the beginning of our safety efforts… Unlike the taxi industry*, our background checking process and standards are consistent across the United States and *often more rigorous than what is required to become a taxi driver*."

133.    In addition, Lane Kasselman bragged to NBC that "*We're confident that every ride on the Uber is safer than a taxi*."

134.    On April 29, 2014, Kasselman stated: "Uber's *industry-leading background checks* help connect consumers with the *safest ride on the road*.... Our driver-partner background checks are more thorough than those of taxis in most cities and include county, state and federal screens going back seven years. We continue to improve and are always working hard to *tighten our policies and processes to ensure that Uber remains the safest transportation option available."*

135.    Around the same time, Lauren Altim – Uber's Senior Communications Associate – issued a statement to NBC – "What I can tell you is that Uber takes passenger safety very seriously… We work every day to connect riders with the safest rides on the road and *go above and beyond local requirements in every city we operate*.... Uber only partners with drivers who pass an *industry-leading screening* that includes a criminal background check at the county, federal, and multistate *level going back as far as the law allows*."

136.    Uber misleads consumers into believing that a ride in an Uber vehicle is not just safe, but the safest, or safer than other ridesharing companies and safer than taxis. According to Uber, this is because Uber (i) adheres to "industry-leading" and "strictest standards possible" regarding safety, vetting, screening, and background checks, (ii) conducts background checks "that

go back as far as the law allows," and which are "more rigorous" than those imposed upon taxi drivers, and (iii) "Uber is this safest transportation option available."

137.    These statements are false.   The screening process is neither the "strictest" nor "industry-leading."

138.    Again, the Uber application process is entirely online and involves filling out a few short forms and uploading photos of a driver's license, vehicle registration, proof of insurance, and a background check.   The application process is designed to take a matter of minutes.

139.    By contrast, to obtain a taxi driver certificate in Philadelphia, the individual must comply with 52 Pa. Code § 30.72, "Standards for obtaining a taxi driver's certificate."

140.    To obtain a taxi driver's certificate, an individual shall apply to the Commission at the designated office in Philadelphia.

141.    Upon applying for a taxi driver's certificate, an individual shall present the following to a representative of the Commission:

> (1)    A current and valid driver's license.
> (2)    One additional form of identification.
> (3)    A completed Taxi Driver's Certificate Application, (Appendix A), signed by the applicant and acknowledged, consistent with section 2 of the Uniform Acknowledgments Act (21 P. S. § 291.2).
> (4)    A criminal history record information obtained from the State Police for the proposed driver dated within 60 days prior to the filing of the application.
> (5)    A driver history from the Department of Transportation or the equivalent from the jurisdiction in which the applicant is currently licensed dated within 60 days prior to the filing of the application.
> (6)    A training certificate issued by the Commission indicating that the applicant has satisfactorily completed driver training as prescribed by this subchapter.
> (7)    A certified check or United States Postal money order in the amount established for issuance of a taxi driver's certificate under 66 Pa.C. S. § 2414 (relating to budget and fees).

142.    In addition, in Pennsylvania, a taxi driver's certificate will not be issued to an individual who does not hold a current, valid driver's license.

143.    An individual must also take and pass an examination to be administered by the Commission, which shall include questions regarding the Commission's driver and vehicle regulations contained in this chapter, the tariff governing rates and charges and the geography of the city and county of Philadelphia.

144.    In addition, Pennsylvania taxi driver training includes customer service training, driver safety training, regional and geographical training. This includes training in the following areas: personal appearance of drivers, driver courtesy, assistance to elderly, infirm or disabled persons, defensive driving techniques, emergency aid, vehicle and equipment inspections, crime prevention, map reading, overview of major street and traffic patterns, identification and location of popular landmarks and locations.

145.    Taxi driver training in the areas described above is mandatory to obtain a taxi driver's certificate, consists of a minimum of 18 hours of instruction, and must be from the Commission or a program provider instructor designated by the Commission.

146.    Pennsylvania also automatically disqualifies drivers with felony convictions, crimes of moral turpitude, and those with an inability to speak English. Putting misinformation on a license application is cause for immediate disqualification and drivers must renew their operating and business licenses annually.

147.    Pennsylvania taxicab applicants must consent to a full criminal background check.

148.    By contrast, for Uber, Checkr simply runs a potential drivers' social security numbers through records databases similar to those held by credit agencies, which only go back for a period of seven years and do not capture all arrests and/or convictions.

149.    Because Checkr does not perform stringent or industry leading background checks when hiring drivers, including when hiring Defendant Fuller, Uber does not require submission of fingerprints for comparison against Department of Justice and Federal Bureau of Investigation databases and does not conduct Live Scan biometric fingerprint background checks of applicants.

150.    Uber also does not conduct in-person interviews of potential drivers; does not check prior employment or personal references; and does not check employment history or speak with former supervisors, all of which are generally performed by taxi companies.

151.    Indeed, upon information and belief, Uber does not do any of the follow when screening drivers, including Defendant Fuller:

   a.    verify vehicle ownership (it only requires that the vehicle is registered and is not more than ten years old);

   b.    require a car inspection prior to use by a driver (Uber does not require periodic/updated inspections either);

   c.    verify that the person applying to be the driver is uploading his or her own personal documents;

   d.    verify that the person who is driving is the same person who opened that account;

   e.    require drivers to submit fingerprints for comparison against Department of Justice and Federal Bureau of Investigation databases;

   f.    conduct Live Scan biometric fingerprint background checks of applicants;

   g.    conduct in-person interviews of applicants;

   h.    verify that social security numbers and other personal identification numbers submitted in the application process belong to the applicants;

     i.       require drivers to attend training classes on driving skills;

     j.       require drivers to attend training classes on harassment or violence;

     k.      require drivers to attend training classes to hone skills needed for safely using mobile Apps while driving;

     l.       require driver to pass written examinations;

     m.    require drivers to pass road vehicle tests; and

     n.      require drivers to pass vision and hearing exams; and/or

     o.      conduct follow-up background checks.[5]

152.     In fact, prior to the initiation of this lawsuit, Uber actively fought against legislation requiring background checks as strong as those demanded of traditional taxis or other transportation providers. *See e.g.*, https://www.nytimes.com/2014/12/10/technology/ubers-system-for-screening-drivers-comes-under-scrutiny.html?_r=0.

153.     As bluntly stated by the district attorney of San Francisco: "You are not using an 'industry leading' background check process if you are not fingerprinting your drivers." *Id.*

154.     Uber has acknowledged that requiring, for example, fingerprint-based background checks is inconsistent with its business objectives because it would impose additional time and cost to the driver application process and deter potential drivers from applying. Because of Uber's ongoing aggressive marketing, most Uber customers are generally unaware of the real risks represented by Uber's own drivers, and continue to believe a ride with Uber is a safer and better alternative than taxis.

---

[5] Upon information and belief, a number of individuals have passed Uber's screening process despite serious felony convictions and there have been reports of individuals driving Uber cars where that person was not the person on the Uber profile. Media outlets have reportedly confirmed the problem by having reporters submit false documents to Uber and still getting approved to be a drive

155.   Further, Uber's representation that its background checks "exceed any local or national standard" across the country and are "more rigorous" than those imposed upon tax drivers, is demonstrably false.

156.   To begin, Uber's screening and background checks are *less rigorous* than those conducted by taxi service.   For example, among other things, taxi services in most cities (i) utilize Live Scan biometric fingerprint background check, which is more rigorous than those imposed by Checkr or similar vendors, (ii) do not impose temporal limits (or go beyond seven years) on background checks, while Checkr or similar vendors have such limitations, (iii) require drivers to take safety training and pass examinations, while Uber has no safety training, no examinations, and resorts to a short instructional video, and/or (iv) requires vehicle safety inspections and maintenance standards,  when Uber does not have any such requirements.   Indeed, the background checks for taxi drivers can take up to two months to complete while Uber's are returned within two to three days.

157.   Further, Uber has unilaterally decided that seven years is the maximum look-back period, a fact that Uber misrepresents to the public.

158.   Uber not only did not meet the maximum standards for screening and background checks, since the filing of this lawsuit, numerous state and local governments have *forced* Uber to conduct more stringent background checks and screening.   Notably, the required additional measures have resulted in the disqualification of thousands of Uber drivers.

159.   Further, in the last several months, Uber announced "several new improvements" to "strengthen" the "screening process" which includes annual criminal checks, an emergency 911 button the App, a more robust checking of arrest and conviction databases, and a safety center inside the App that features insight into the company's process for screening its drivers, displays

real-time location from the moving car, including addresses, so riders can share that information directly with the emergency operator, emergency rider contacts who will receive information on their trips, letting them arrive at their destination, and more.

160.    Riders, such as Plaintiff, reasonably relied on Uber's representations and promises about its safety, hiring, screening, and security measures prior to using Uber's services and while using Uber's services.

161.    Plaintiff reasonably relied, and was induced to use Uber's services in December 2016, as a result of the aforementioned misrepresentations, which he viewed on Uber's website, blog, and other media outlets throughout 2014, 2015, and 2016.

162.    Uber knew that its representations and promises about rider safety were false and misleading, yet continued to allow its riders, including Plaintiff, to believe in the truth of its representations and promises, and to profit from its riders' reliance on such representations and promises.

163.    Uber could easily implement additional screening and background check measures to compete with other transportation providers and taxis, but it chooses not to.

164.    Indeed, Uber disclaims all supervision and responsibility for the conduct of its drivers.  Buried in the legal section of the App is the following disclaimer:

**5. Disclaimers; Limitation of Liability; Indemnity.**

**DISCLAIMER.**

THE SERVICES ARE PROVIDED "AS IS" AND "AS AVAILABLE." UBER DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, NOT EXPRESSLY SET OUT IN THESE TERMS, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE AND NON-INFRINGEMENT. IN ADDITION, UBER MAKES NO REPRESENTATION, WARRANTY, OR GUARANTEE

REGARDING THE RELIABILITY, TIMELINESS, QUALITY, SUITABILITY OR AVAILABILITY OF THE SERVICES OR ANY SERVICES OR GOODS REQUESTED THROUGH THE USE OF THE SERVICES, OR THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE. UBER DOES NOT GUARANTEE THE QUALITY, SUITABILITY, SAFETY OR ABILITY OF THIRD PARTY PROVIDERS. YOU AGREE THAT THE ENTIRE RISK ARISING OUT OF YOUR USE OF THE SERVICES, AND ANY SERVICE OR GOOD REQUESTED IN CONNECTION THEREWITH, REMAINS SOLELY WITH YOU, TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW.

## COUNT I
### (NEGLIGENCE AGAINST ALL PARTIES)

165. Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

166. Defendants, by and through their acts and omissions, or those of their agents, servants, workers, and/or employees, were negligent and reckless, which is outlined above.

167. By reason of the carelessness, negligence, recklessness, and/or statutory violations Defendants, or through their respective agents, servants, workers, and employees, as aforesaid, caused Plaintiff to sustain serious physical and emotional injuries.

168. Accordingly, Plaintiff is entitled to recovery against Defendants in an amount to be determined at trial.

## COUNT II
### (NEGLIGENCE AGAINST DEFENDANT FULLER)

169. Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

170. Defendant Fuller was unreasonable, negligent, and breached his duty to exercise due care generally and in the following specific respects:

a. Failing to use appropriate, proportionate, and/or reasonable force;

b. Using excessive, disproportionate and unreasonable force;

c. Escalating the dispute to the use of unreasonable force;

d. Misunderstanding the situation and erroneously perceiving a threat of serious bodily harm;

e. Continuing to assault Plaintiff when could not possibly have been a threat;

f. Assaulting a person who was not the aggressor;

g. Attempting to flee the scene after assaulting Plaintiff, failing to contact his Uber regarding his dispute with Plaintiff, failing to contact authorities or emergency personnel after assaulting Plaintiff to point of unconsciousness;

h. Acting unreasonably throughout the altercation;

171. Defendant Fuller, by reason of his carelessness, negligence, and/or reckless conduct, caused Plaintiff to sustain serious physical and emotional injuries.

172. Accordingly, Plaintiff is entitled to recovery against Defendant Fuller in an amount to be determined at trial.

## COUNT III
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST DEFENDANT FULLER)

173. Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

174. Defendant Fuller engaged in conduct toward Plaintiff that is extreme and outrageous so as to exceed the bounds of decency in a civilized society.

175. Defendant Fuller intended to and did intentionally and recklessly cause Plaintiff to suffer severe emotional distress.

176.   As a direct and proximate result of Defendant Fuller's conduct, Plaintiff has suffered, and continue to suffer, severe emotional distress, for which he is entitled to an award of damages.

177.   Accordingly, Plaintiff is entitled to recovery against Defendant Fuller in an amount to be determined at trial.

## COUNT IV
## (ASSAULT/BATTERY AGAINST DEFENDANT FULLER)

178.   Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

179.   The violent acts committed by Defendant Fuller against Plaintiff amounted to a series of events creating a reasonable apprehension in Plaintiff of immediate harmful or offensive contact to Plaintiff's person, all of which were done intentionally and without Plaintiff's consent.

180.   Defendant, Fuller intentionally initiated a violent assault and bodily injury, violating the common law of the Commonwealth of Pennsylvania whose courts have adopted the Restatement 2d of Torts concerning the offenses of assault and battery, including, without limitation:

    i.   § 13 Battery: Harmful Contact – An actor is subject to liability to another for battery if: a. he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and b. a harmful contact with the person of the other directly or indirectly results.

    j.   § 15 What Constitutes Bodily Harm – Bodily harm is any physical impairment of the condition of another's body, or physical pain or illness.

k.   § 18 Battery – Offensive Contact (1) An actor is subject to liability to another for
battery if: a. he acts intending to cause a harmful or offensive contact with the
person of the other or a third person, or an imminent apprehension of such a contact,
and b. an offensive contact with the person of the other directly or indirectly results.

l.   § 21 Assault (1) An actor is subject to liability to another for assault if; a. he acts
intending to cause a harmful or offensive contact with the person of the other or a
third person, or an imminent apprehension of such a contact, and b. the other is
thereby put in such imminent apprehension.

181.   As a direct and proximate result of the aforementioned conduct, Plaintiff has
sustained and will sustain physical injury, pain and suffering, serious psychological and emotional
distress, mental anguish, embarrassment and humiliation.  As a direct and proximate result of the
aforementioned conduct, Plaintiff has incurred medical expenses and other economic damages.

182.   Accordingly, Plaintiff is entitled to recovery against Defendant Fuller in an amount
to be determined at trial.

**COUNT V**
**(NEGLIGENCE & VIOLATIONS OF THE DRAM SHOP ACT**
**AGAINST DEFENDANT CAVANAUGH'S)**

183.   Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth
herein.

184.   Defendants Cavanaugh's, by and through the acts and omissions of its agents,
servants, workers and employees, in serving alcoholic beverages to the visibly intoxicated in the
course and scope of their employment, violated the statutes of the Commonwealth of Pennsylvania
and was careless, negligent and reckless in numerous respects including, without limitation:

a. Selling and continuing to sell and serve alcoholic beverages to Plaintiff when he was visibly intoxicated;

b. Failing to detect that Plaintiff was in a visibly intoxicated condition as a result of their continual serving of alcoholic beverages to him;

c. Selling and continuing to sell and serve alcoholic beverages to Plaintiff when Defendants Cavanaugh's knew or had reason to know that the imbibing of multiple alcoholic beverages by an individual constitutes a risk of harm and renders him/her dangerous to himself and others by virtue of his being in an intoxicated condition;

d. Violating the statutes and laws of the Commonwealth of Pennsylvania, including, but not limited to, The Pennsylvania Dram Shop Act, 47 P.S. §4-493, "Unlawful Acts relative to liquor, malt and brewed beverages and licensees," which, in §4-493(1) expressly renders unlawful "Furnishing Liquor or Malt or Brewed Beverages to Certain Persons" including "any person visibly intoxicated;

e.  Failing to establish, monitor, and administer training, programs and operating procedures designed to identify and assist visibly intoxicated patrons such as those model programs set forth in Pennsylvania Statute 47 P.S. §4-471.1, "Responsible alcohol management" recommending training not less than fifty percent of the alcohol service personnel as well as mangers/owners of licensed establishments to properly serve alcoholic beverages;

f. Failing to establish, monitor, and administer training, programs and operating procedures such as those model programs set forth in Pennsylvania Statute 47 P.S. §4-471.1, "Responsible alcohol management" whose purpose is to train alcohol

service personnel as well as mangers/owners of licensed establishments to prevent service to visibly intoxicated persons;

g.  Failing to establish, monitor, and administer training, programs and operating procedures such as those model programs set forth in Pennsylvania Statute 47 P.S. §4-471.1, "Responsible alcohol management" whose purpose is to train mangers/owners of licensed establishments to monitor employees to assure that the establishment does not serve visibly intoxicated persons;

h.  Failing to establish, monitor, and administer training, programs and operating procedures such as those model programs set forth in Pennsylvania Statute 47 P.S. §4-471.1, "Responsible alcohol management" to develop an appropriate alcohol service policy;

i.  Failing to establish, monitor, and administer training, programs and operating procedures such as those model programs set forth in Pennsylvania Statute 47 P.S. §4-471.1, "Responsible alcohol management" to train alcohol service personnel as well as mangers/owners of licensed establishments to know Pennsylvania law relating to the sale and alcoholic beverages and particularly to the prohibitions against serving visibly intoxicated persons;

j.  Having a policy and practice of continuing to serve persons without adequately checking to see whether the person was in fact intoxicated or, exhibited signs of visible intoxication,

k.  Failing to have and enforce policies and practices which include a drink cut-off limit for alcoholic beverages;

l.   Failing to have and enforce policies and practices which include a time limit so that defendant's alcohol service personnel and managers would not sell alcohol and/or serve alcohol after patrons had been drinking alcohol for a defined period of time,

m.   Having a policy and practice to encourage patrons to continue drinking alcohol after they became visibly intoxicated;

n.   Allowing Plaintiff to exit Defendants Cavanaugh's facility after he became both intoxicated and visibly intoxicated;

o.   Failing to have a policy or practice of helping intoxicated and visibly intoxicated persons sober up before exiting their facility;

p.   Failing to have a policy or practice of helping intoxicated and visibly intoxicated persons reach their homes in safety by providing direct transportation or by other means;

q.   Tacitly approving alcohol service personnel and other employees violating Pennsylvania law by selling and serving alcohol, liquor, malt and brewed beverages to patrons until they became intoxicated and, continuing thereafter to serve them alcohol while visibly intoxicated;

r.   Failing to have or enforce any policy or practice of disciplinary standards for their employees regarding the sale of alcoholic beverages; and

s.   Failing to have or enforce any policy or practice of proactively and effectively monitoring their employees engaged in the serving of alcoholic beverages.

185.   By reason of the carelessness, negligence, recklessness and statutory violations of Defendant Cavanaugh's, by and through their separate and respective agents, servants, workers

and employees, as aforesaid, Plaintiff was caused to sustain serious, debilitating, permanent and life altering injuries as more fully described in the preceding paragraphs of this Complaint.

186.    Accordingly, Plaintiff is entitled to recovery against Defendant Cavanaugh's in an amount to be determined at trial.

## COUNT VI
## (NEGLIGENT HIRING/RETENTION/TRAINING/SUPERVISON AGAINST UBER)

187.    Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

188.    Defendant Uber had a duty to use reasonable care in the selection, hiring, retention, training, and supervision of its agents, servants, and/or employees.

189.    At all times relevant hereto, as a provider of transportation and according to Uber's own policies, Defendant Uber owed a duty to consumers, including Plaintiff, to retain or employ a driver that was adequately educated, skilled, trained, and experienced in providing transportation.

190.    In addition, given that Uber heavenly markets and transports intoxicated passengers, including Plaintiff, Uber owed a duty to consumers to retain or employ a driver that was adequately educated, skilled, trained, and/or experienced in transporting intoxicated passengers.

191.    Uber owed a duty to consumers to retain or employ a driver that was adequately educated, skilled, trained, and/or experienced in addressing complaints or disputes with, between, or among riders and drivers.

192.    Defendant Uber breached the duties owed as set forth in the preceding paragraphs, including but not limited to in the following manners:

a. by failing to select, retain, and/or hire personnel properly qualified to operate Uber vehicles in transport consumers in a safe and reasonable manner;

b. by failing to properly screen potential drivers, including Defendant Fuller, before retaining or hiring him;

c. by selecting, retaining, or hiring Defendant Fuller without fully investigating his background;

d. by failing to abide by proper screening protocols before selecting, retaining, and/or hiring agents and/or employees, including Defendant Fuller;

e. by failing to train Uber drivers to abide by all existing regulations;

f. by hiring potentially dangerous drivers including Defendant Fuller;

g. by failing to provide follow-up, in-service safety training;

h. by failing to provide follow-up safety screening, including for Defendant Fuller;

i. by failing to terminate Defendant Fuller prior to the incident in question;

j. by failing to properly supervise drivers, including Defendant Fuller, while such drivers are operating Uber vehicles;

k. by failing to train drivers, including Defendant Fuller, on how to address disputes regarding transportation and a consumer's desired destination;

l. by failing to train drivers, including Defendant Fuller, on how to address or handle intoxicated passengers;

m. by failing to train drivers, including Defendant Fuller, on how to address or handle injured passengers or those that require emergency medical attention;

n. by failing to supervise drivers, including Defendant Fuller, at all, let alone when a dispute arises between passengers and drivers;

41

o.  by failing to inform Defendant Fuller of Plaintiff's desired destination prior to agreeing to transport Plaintiff;

p.  by penalizing drivers, including Defendant Fuller, who decline rides rather than connect Plaintiff with the appropriate driver in the first place;

q.  by failing to train Defendant Fuller on Uber's policies regarding declining rides;

r.  by failing to, through a supervisor or the App, dispatch a driver other than Defendant Fuller who desired to drive Plaintiff to his desired destination or a particular area, such as southern New Jersey;

s.  by failing to inquire as to whether Defendant Fuller would travel to Plaintiff's desired destination and, determining whether to decline to provide service to Plaintiff upon learning Defendant Fuller would refuse to provide transportation;

t.  by failing to implement technology to allow drivers and riders to select mutually agreeable trips;

u.  by failing to implement technology to allow Uber or its drivers to divert passengers to other Uber drivers who are willing to accept passengers regardless of destination or to ensure that a driver is willing to travel to the particular destination;

v.  by failing to implement a re-matching policy and/or train Defendant Fuller on the use of a re-matching system; and/or

w.  by failing to provide a supervisor who could intervene to resolve a dispute about Plaintiff's desired destination, to dispatch another Uber driver to the location, to assist Defendant Fuller in addressing/handling an intoxicated passenger, to assist Defendant Fuller in contacting authorities or emergency personal once Plaintiff was injured.

193.    Defendant Fuller was unskilled, unfit and incompetent to perform the work for which he was retained and/or hired.

194.    It was reasonably foreseeable to Uber that Defendant Fuller would expose riders to an unreasonable risk of harm.

195.    As a direct and proximate cause of Uber's failure to exercise reasonable care, Plaintiff was assaulted and sustained and will sustain physical injury, pain and suffering, serious psychological and emotional distress, mental anguish, embarrassment and humiliation. Plaintiff has also incurred medical expenses, professional expenses, lost future income, and other economic damages.

196.    Accordingly, Plaintiff is entitled to recovery against Defendant Uber in an amount to be determined at trial.

## COUNT VII
## (FRAUD AGAINST UBER)

197.    Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

198.    Uber made intentional misrepresentations of fact to Plaintiff regarding its hiring, screening, vetting, training, and background checks of divers.

199.    Uber misleads consumers into believing that a ride in an Uber vehicle is not just safe, but the safest, or safer than other ridesharing companies and safer than taxis, that it adheres to "industry-leading" and "strictest standards possible" regarding safety, vetting, screening, and background checks, that it conducts background checks "that go back as far as the law allows," and which are "more rigorous" than those imposed upon taxi drivers, and that is "Uber is this safest transportation option available."

200.   Uber's false statements concerning its safety, hiring, screening, and background check measures detailed herein were made knowingly, or with a willful, wanton and reckless disregard for the truth, and intended to deceive and defraud Plaintiff into agreeing to utilize Uber's services.

201.   Uber made these misrepresentations with the intent to cause Plaintiff to rely on this false information and induce him into utilizing Uber's services, in spite of the concerns Plaintiff had about safety.

202.   As a result of Uber's deliberate misrepresentations of material facts, Plaintiff suffered significant damages.

203.   Uber engaged in fraud, oppression and/or malice, and was in conscious disregard of the rights and safety of others, including, but not limited to, Plaintiff, so as to warrant the imposition of punitive damages.

204.   Accordingly, Plaintiff is entitled to recovery against Uber in an amount to be determined at trial.

## COUNT VIII
## (NEGLIGENT MISREPRESENTATION AGAINST UBER)

205.   Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

206.   By engaging in intentional acts and omissions alleged in the complaint, Uber has made misrepresentations to and defrauded Plaintiff.

207.   Uber intended that Plaintiff would rely on the material misrepresentations and omissions to his detriment.   Uber acted willfully, knowingly, and/or recklessly with respect to the acts and omissions set forth above.

208.   Plaintiff reasonably relied upon the misrepresentation of Uber to Plaintiff's detriment.  Plaintiff suffered injury and damages as result of such fraud.

209.   Uber concealed and suppressed and/or omitted material facts regarding the transportation services provided to Plaintiff.

210.   As a direct and proximate cause of Uber's misrepresentations, omissions, and concealment of the truth, Plaintiff has been damaged and will continue to suffer damages.

## COUNT IX
## (UBER VIOLEATED PAUTP-CPL—73 Pa. Cons. St. § 201-1 et seq.)

211.   Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

212.   Uber's transactions and business interactions with Plaintiff and other Pennsylvania customers are subject to the requirements of Pennsylvania law, including the PAUTP-CPL, 73 Pa. Cons. St. § 201-1 et seq.

213.   The PAUTP-CPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Cons. St. § 201-2(4).

214.   The PAUTP-CPL also prohibits (1) "[k]nowingly misrepresenting that services, replacements or repairs are needed if they are not needed"; and (2) "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 Pa. Cons. St. § 201-2(4)(xv), (xxi).

215.   As a result of Uber's violations of the PAUTP-CPL, Plaintiff has suffered ascertainable losses and damages.

216.   Plaintiff is entitled to relief for Uber's violations of the PAUTP-CPL, including but not limited to actual damages, statutory damages of $100 per violation, treble damages, costs,

attorneys' fees, injunctive relief, declaratory relief, and additional legal or equitable relief as necessary or proper. *See* Pa. Cons. St. § 201-9.2

## COUNT X
## (UBER VIOLATED THE NEW JERSEY CONSUMER FRAUD ACT)

217.   Plaintiff alleges and asserts each of the preceding paragraphs as if fully set forth herein.

218.   The conduct described above constitutes violation of the New Jersey Consumer Fraud Act, ("NJCFA") N.J.S.A. § 56:8-1 et. seq.

219.   Uber engaged in concealment, suppression, or omission in violation of N.J.S.A. § 56:8-1 in selling and advertising services under false pretenses.

220.   Uber engaged in the concealment, suppression, or omission of the aforementioned material facts with the intent that Plaintiff and/or the general public would rely upon the concealment, suppression, or omission of such material facts.

221.   Plaintiff would not have used Uber's services had he known or become informed of the material misrepresentations by Uber.

222.   Uber's concealment, suppression, or omission of material facts as alleged herein constitute deceptive and fraudulent business practices within the meaning of N.J.S.A. § 56:8-1 et. seq.

223.   As a direct and proximate result pf Uber's conduct, Plaintiff has suffered damages and ascertainable loss for which Uber is liable to Plaintiff, plus attorneys' fees and costs, along with equitable relief prayed for herein in this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in their favor and against

Defendants, containing the following relief:

1. An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all physical, monetary and/or economic harm; for harm to his professional and personal reputations and loss of career fulfillment; for all non-monetary and/or compensatory harm, including, but not limited to, compensation for mental anguish and physical injuries; all other monetary and/or non-monetary losses suffered by Plaintiff;

2. An award of punitive damages;

3. An award of costs that Plaintiff have incurred in this action, as well as reasonable attorneys' fees and expenses to the fullest extent permitted by law; and

4. Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Respectfully Submitted,

Dated:  September 14, 2018          /s/

Matthew A. Luber (Pa. Id. No. 309323)
mal@njlegal.com
R. Armen McOmber, Esq. (admitted *pro hac vice*)
ram@njlegal.com
McOmber & McOmber, P.C.
30 S. Maple Avenue
Marlton, New Jersey 08053
Phone: 856-985-9800
Fax: 732-530-8545

*Attorneys for Plaintiff*